**Affidavit of Rochelle Pouget**
**Dated: May 31, 2023**

I would like to make it very clear that Kysa Crusco has now been disingenuous about the alleged (3) GAL complaints filed against her. She has been lying about this for years to the Attorney Discipline Office, Goffstown Family Court judges, a Superior Court judge, and now a Federal judge. I can prove she has been lying on sworn affidavits, under oath at hearings, and on Motions 100% without a doubt I have hard irrefutable evidence, which is why I need an immediate evidentiary hearing. She is trying to have this case dismissed against her siting immunity or quasi immunity, but that does not apply to intentional GAL Fraud, collusion, intentional obstruction of justice, intentional neglect of a child who is being molested, intentional interference in DCYF investigations without the proper releases to even speak to DCYF. Intentional lies to remove parental rights after being told she did not have the right to speak to my child's therapist without my attorney and/or me present and there was a medical release on file at The Counseling Center of Nashua stating that, when she contacted Dr. Taracena anyway, the same day she lied about contacting him on an affidavit to intentionally remove my parental rights to assist my husband and his attorney in covering up the fact that my husband left our child alone with the other child who was molesting her after the CAC, DCYF, and State Police were involved in Feb 2014 and it was confirmed my child was molested. In addition, she was colluding with my husband and attorney Patricia a. Muprhy to financially abuse me and they both covered up the fact that my husband cashed out his $98k pension from Teradyne and his stock options from NetApp after there was a financial restraining order in place in 2012 when I filed for divorce. They are all now involved in this real estate fraud with the quit claim deed these people (gal/attorney Kysa, attorney Murphy, judges Cross and Gorman, court clerk Gloria Gidari have committed multiple felonies and violations of Constitutional Rights involving my child, me, and others. Now there is insurance fraud involving Allstate, Remax, Salem Five, and the owners of 20 Lincoln Drive LLC. I am being psychologically tortured by my own law enforcement agency, GAL Kysa Crusco, County AG, NH DOJ, NH AG, Public Integrity Unit, because nobody nobody bothered to contact anyone in my husband's family or mine to investigate the fact that he had been defrauding and abusing his family and friends his entire adult life. He was a sociopath and I can prove that too!

The reason she gets away with her lies is due to the fact that the Goffstown Family Court has an impeached judge (Philip Cross) denying evidentiary hearings to have her removed as a GAL and he approved the removal of my Constitutionally Protected Parental Rights the same month, if not day he denied me an evidentiary hearing and this was all done with the assistance of Gloria Gidari the Deputy Court Clerk at Goffstown Family Court while Lynn Killkelley was still he boss. Lynn Killkelley conveniently retired after I found multiple court orders with white out completely obscuring what Philip Cross was recommending and what Judge Suzanne Gorman was ordering in my case files. They all involve Kysa Crusco who is now lying to the Federal Courts too! Not only that, I know other victims of Kysa so they checked their case files in Hooksett and I checked another one in Manchester and there is white out obscuring things in their cases too. The NH AG's Public Integrity Unit is covering this all up by telling me it is legal to

obscure a judge's and referees comments and orders, therefore, they won't even investigate it. I went to the JCC to file a complaint and they dismissed it because they know the Public Integrity Unit is covering it up and they have people on the board connected to these predators. There were and/or still are people on the GAL board connected to Kysa. There are people in the Hillsborough County AG's Office who are connected to Kysa and I have a private Facebook message from Denis Hogan the former Hillsborough County AG, confirming that. That was his excuse for not investigating her crimes. Then Lisa Wolford, who was involved in accusing a woman of witchcraft with Dick Tracy, and the hearing where it was dismissed is all online. How ridiculous can our NH DOJ and NH AG's office get? We are seriously accusing people of witchcraft these days and actually having hearings about it, MY GOD! So you know who is testifying at my hearings if I ever get a chance to actually have one.

I would like to make it very clear, that Kysa Crusco admitted to Mark Putney, the Hillsborough County AG investigator, that she lied on a sworn affidavit, and he did not arrest her. She wiggled her way out of the arrest by lying to him about why she lied. She claims the fact that she lied is irrelevant because we had a hearing after, where she told the truth. Well, that is a lie as well. I am not sure if my deceased ex-husband, Chief James Brace, Kysa Crusco, or anyone else of their brain chemistry type, are capable of telling the truth to be honest with you and they can manipulate and spin a story like I've never seen before and they are absolutely dangerous to society. I am not joking and I not insane. If you only knew how many people have been harmed by one man's actions because Chief Brace and Kysa Crusco chose not to investigate DV properly, according to their protocols, trainings, skill levels, and experience. I will tell you, and pray someone is reading this that can put a stop to it.

I, Rochelle Pouget, was financially and emotionally abused from 2003 on, due to the actions of James Reid Coburn and I'm still being financial abused by him, even though he's been deceased by him.

Prior to me being financially abused by James Reid Coburn, his second wife Lori Higgins, was financially abused by him and I have the evidence. I provided the evidence to Mark Putney. James Reid Coburn not only used her credit without her knowledge, he failed to refinance an RV he was awarded during their divorce in 2002, and he trashed her credit. It appears he was using an American Express card of hers or his first wife's as well. I have the account number that he used to pay it back in 2006 and 2007 with our money, without my knowledge. My husband was a very controlling man who was 16 years older than me and he quickly took over the finances when I called him out for being overextended shortly after we were married and had a joint checking account.

My mother was financial abused by James Reid Coburn in 2010 when he lied to her and informed her/me that we were going to move back to CA/NV area and we were going to buy a house with a guest house for my mother. My mother was making approximately $48k a year and had good credit. James Reid Coburn conned her into giving him $60k to fix up our house and put a down payment on our house with a guesthouse for her, so her daughter and her grandson (a cancer survivor) could come back home. My mom lives for her two daughters and

her grandchildren and I left the town I grew up in, where my mom and sister still live, to move here at the age of 36 when I had a 14 year old son, who couldn't stand my husband and didn't want to leave. This is a very emotional story for me and I've been abused and in fight or flight mode since I let James Reid Coburn borrow $10k from me before we were married and he didn't give it back. He slowly and diabolically financially abused me and his own family because he had an outrageous appetite for material things that he would use to build a façade that he had it all together. He did not have it all together in his brain and he knew it and admitted it and Kysa Crusco didn't even ask him about it until after my parental rights were removed. Some investigation huh? I'll attach that letter with this affidavit to see what failed to investigate and how she then went on to hide my ex-husband's mental health issues from the courts and the woman (her friend) who performed James Reid Coburn's (court ordered) psychological evaluation. It should have been a forensic psychiatric evaluation and that is exactly what I am going to request this Federal Court to GRANT with this Motion because we have predators who are getting away with destroying families intentionally and the only way to get them to stop is to have them undergo a forensic psychiatric examination including a polygraph testimony from people who know them and/or have been scammed/harmed by them. They are Sociopaths and they are very good at what they do. They can charm the pants off anyone and lie about anything because they simply don't have the ability to care, period. They can fake that they care, but deep down, we all know they don't give a shipwreck about anyone but themselves. They can't, it's not in their brain chemistry. Who would refuse to investigate multiple domestic violence incidents involving children and go so far as to tamper with law enforcement lobby surveillance videos to obstruct justice and hide what they do/say to women who are being abused in their lobby??? Everyone knows that law enforcement officer or officers would be fired immediately and thrown in jail, and that is why Dick Tracy at the DOJ, intentionally refused to have those lobby videos forensically examined and that is why everyone else has refused to have them examined as well. It's not a case of not having the ability to have them forensically examined, it's a case of, "What an idiot dude!", who would LOGICALLY risk losing their career, their pension, and spending time in the slammer?" and I'm guessing that's why Dick Tracy left that subliminal message in his report. It's not that I was illogical, it's that Chief James Brace and Sgt. Aiken were so bad at tampering those videos and audio and it's so obvious, that if they were examined and if the technicians from the company who manufactured the surveillance equipment, were to testify in court, Chief James Brace and Sgt. Aiken would lose everything.

That is why the County AG's Office refused to have them forensically examined. That is why the NH DOJ under Jane E. Young's direction, refused to have those videos forensically examined.

2014-2016: After Dick Tracy and Patrick Queenan blew off my complaints against Chief Brace and refused to have the videos forensically examined, I went to the Town of New Boston Selectman's Office for help and they blew me off and refused to get the manufacturers of the surveillance equipment to come check it out to see if the flaws that Chief Brace reported with the surveillance equipment were consistent with what was done to the edits and muted sections of the videos he gave me. They weren't and I've proven that with the two forensic examinations I've had done. It was during the 2nd forensic examination that I learned Chief Brace can try and lie his way out of the surveillance videos being edited, but he can't lie about

the muted sections that are there while the video is still playing. After I notified the DOJ that I was aware of that and that is what the forensic examiner pointed out, Chief Brace had the audio system replaced, even though his front office clerk, Cathy Widener, claimed it has always been working, on video that I have in my possession. If anyone would bother to read the Alexandra Drake lawsuit and the Jennifer Watson lawsuits against Chief Brace and others, they would understand how this guy does business. He is younger than me and I'm 54. He became the Chief of Police when I was 44, so he was in his early 40's or late 30's when he became the Chief of Police and I'm guessing that had a major impact on his decision to target me, rather than do a basic DV investigation to help protect my daughter and me.

2017-2019: I went back to the DOJ with new information about Kysa, my husband, and the NBPD and Lisa Wolford blew me off and accused me of being a "conspiracy theorist" on the phone. I sent her an email blasting her for her unprofessional conduct and intentional obstruction of justice and I have each and every email I've ever sent or received from all of these people. I took screen shots of ALL of them to be used for evidence if needed and they were all put in order to make it easier for the authorities and the public to read, if it came down to that.

2020: I went to the County AG's Office and was guaranteed a full investigation of my case and that was another lie. They did not investigate the Real Estate Fraud issue and tried to gaslight me again into believing I'm crazy for thinking it's a criminal issue, not just a civil issue. They refused to have those lobby videos forensically examined too. Then I went to Geoff Ward and Jeff Strelzin and Jane Young and they refused to have them forensically examined and/or overrule John Coughlin's dismissal of my complaints.

2022: White-out discovered in my case file, Tania Perry's case file, and Kim Ostlund's case file and all three of us had issues with Kysa Crusco and filed complaints against her at the GAL board and/or County AG's Office and not one person has ever contacted them. The Public Integrity Unit refuses to investigate these white out issues and they are claiming it's okay to completely obscure what a judge wrote on a court order.

I was hoping and praying these people would have been arrested and prosecuted by now, after everything that has happened over the years with lawsuits against the NBPD by two female police officers, the scandals in the media about Judge Julie Introcaso, Judge Bruce Dalpra, Judge Philip Cross, and Judge Paul Moore (all involved in my two-year divorce/custody case and there are more like Weaver who have obstructed justice, I just haven't named them all in this lawsuit) and all the things I've read about their walk down the judicial hall of shame. But, when you have sociopaths in law enforcement agencies who are at the top and Family Court system with Guardian ad Litem who are also attorneys/sociopaths who enjoy wreaking havoc intentionally, for profit, SOMEBODY has to track it to show the patterns of behavior, so I guess that's me.

I did not want this role and I do not enjoy this role I've taken on, but I am doing it to protect children and expose the malfeasance in the lower courts. I am praying hard a school teacher who has been taken down by this system will get a fair trial, so I can prove once and for all what

Page 4

these people are doing to the citizens of NH. It is a passive aggressive attack on families and it needs to stop before a child gets killed due to their intentionally negligent actions.

Kysa Crusco has been intentionally lying on sworn affidavits and under oath. Not only has she admitted she lied on her sworn affidavit (after I provided hard irrefutable proof) she continues to intentionally lie to the courts and did so recently in two or three different hearings in Manchester. She is claiming I filed 3 GAL complaints against her and they were all dismissed. That is not the truth. I filed the first complaint against her when she was an active GAL, so it was dismissed due to the fact that the GAL Board will not investigate cases during active GAL cases. I had to wait until after she was no longer the GAL on my case before the Board would even take it into consideration. Then they dismissed it without any reason whatsoever, after I was told I could amend it and add additional information that I had gathered over the years after I originally filed it. I raised a stink about that, so the GAL Board allowed me to add the additional information and re-submit it. Then they dismissed it, even though there was hard evidence of collusion, obstruction of justice, false sworn affidavits, HIPAA violations, lack of DCYF releases, etc.

As it turns out and I was unaware of this at the time, the GAL Board and members who are supposed to provide oversight and stop these clowns, cannot be sued, so it appears to be an avenue for corruption for certain attorneys and judges and they get to put extra things on their resumes to deceive the public (online) into believing they area honest, decent, hard- working human beings, when in reality, they can't get business due to their lazy, unethical, immoral, and criminal nature. That is why some of them get their GAL cases extended and their GAL fee caps increased. They are too lazy to do the proper investigation to protect children and they have an agenda. They get away with it in Goffstown because they have **Gloria Gidari** protecting them. At a hearing in 2015 or 2016, Gloria Gidari tried to chastise me for speaking to someone in the courtroom about the fact that I had just learned that Philip Cross had been impeached. It was well after my divorce/custody case was finalized and my child was ripped away from me for profit. When Gloria defended Philip Cross that way, I knew in the core of my being, she is protecting him. There was nobody else in the courtroom except the deputy and court was not in session or maybe it was and it was being recorded and I didn't realize it. Whatever the case may be, after everything I had been through, it was a lightbulb moment for sure.

That is when I realized, hey wait a minute. The day before my parental rights were removed in August 2014, I was trying to protect my daughter at the Goffstown Courthouse and started to write up a Petition for a restraining order, but I ran out of time. That's when it dawned on me that **Gloria Gidari** was not only defending Philip Cross, she was defending her own interference of alerting Kysa Crusco about the fact that I was trying to file a restraining order, which enabled Kysa Crusco, James Reid Coburn, Patricia A. Murphy and Philip Cross, to manipulate the language in their sworn affidavits to remove my parental rights on August 28th, 2014. Pretty sure Gloria gave Kysa the heads up so they are all in collusion on this one.

They were doing it to protect James Reid Coburn because James Reid Coburn was going to have to explain why he left our child alone with a child who had been molesting her after the CAC

Page 5

already determined they should have direct supervision if they were to play together. DCYF didn't put that in their report, but that is standard procedure to protect children. If they didn't inform James Reid Coburn he needed to provide proper supervision and Kysa Crusco and Patricia Murphy didn't tell him he needed to do it, he wasn't going to do it because he didn't care what happened to his little girl. He was incapable of feeling and I am not joking. He wanted everyone to believe I was crazy and making it all up, so he convinced himself that he didn't need to provide direct supervision. He didn't like watching kids. He never watched kids. He had a short fuse and little patience for children, which is why I raised our children and all three of them can verify that. My step-son, who is in his late 30's will testify to that. My son who is in his early 30's will testify to that and my daughter in high school can now testify to that. I am a very involved mom and I do everything humanly possible to ensure they are raised with morals and are kind and honest human beings. Thank God all three of them have the ability to feel and they are not of the same sociopath mindset as their father/step-father.

That is why he refused to go to the counseling appointment with Linda Bagshaw to discuss the molestation after it occurred the first time. What father wouldn't show up to a counseling appointment after his child reported what I wrote above? That is why I insisted that John Young from DCYF put that language in the 2nd DCYF report. He stated in writing that the two children needed direct supervision if they were going to play together again.

That is the only thing I requested from the beginning and they twisted it into making it appear as though I said the kids could no longer play together and that I was jumping from agency to agency "to get what I wanted". Seriously? I didn't do ANYTHING without my attorney giving me instructions because I was scared to death of what was happening to me. My attorney and my daughter's counselor told me I had to repot the 2nd incident to DCYF because I was the one my daughter opened up to. After I made that call and Kysa learned from Gloria that I was in the Courthouse ready to file a Peition for a restraining order, she pounced first and contacted Patricia Murphy via email (that I have) and stated, I would support a change in custody. Now mind you, this is after the Goffstown Police had to instruct my husband to provide direct supervision because he was too stubborn to give me that guarantee in a text when I asked him to. I never once told him not to let the kis play together and I have all the texts and emails from back then. James Reid Coburn and I did not speak to each other during the divorce. We communicated via email and text only, with the exception of maybe one or two times at a soccer field in Oct 2013 and one time at the gym in New Boston in 2016 or 2017. That's how serious this is and what I had to do to protect myself from his false accusations. I had to completely cut off all verbal communication with him because he lied so much about what I said and did. It was the only way to protect myself from him telling others that I was speaking negatively to him or about him.

I had suspicions later on about Gloria Gidari and Judge Suzanne Gorman when Gorman didn't give James Reid Coburn any consequences for completely destroying my credit intentionally and failing to even attempt to refinance or sell our house in the three years he was given in our mediation agreement. I wanted to go back to court to get my house back if he wasn't going to sell it, but he ended up getting sick and dying from cancer before I had the chance and I was

Page 6

going through my own health issues after being diagnosed with a brain tumor in 2018 and having to have surgery for a cochlear implant on my left side because my balance nerve and hearing were severed by the tumor. When I say I have had a lot of life experiences, I'm not even getting started yet. Anyway, at the hearing for my Discover Credit Card, that I refused to pay because James Reid Coburn committed fraud by stealing my Discover Card check and writing a check to himself for cash for thousands of dollars, when he wasn't an authorized user on any of my credit cards, Gloria and Suzanne Gorman colluded to help the attorney who showed up totally unprepared for court and had no idea what he was even there for after we had already mediated twice. I asked Judge Gorman to dismiss the case and instead of doing that, Gloria Gidari and Suzanne Gorman left the courtroom while it was in session and retrieved the file for the other attorney, so he could then argue the case. Can you even believe that? That is what they are willing to do to bring me down. Gorman ruled against me and I ended up having to pay the discover card debt, but I didn't pay it for a long time because I had major health issues and financial issues due to the lack of child support and alimony and the fact that my credit was intentionally destroyed.

Then in the middle of Covid after I filed a complaint at the County AG's Office about what Judge Gorman and Gloria Gidari had done, the Discover Card case magically appears again and I had to pay it in order to be able to refinance my house. If you think I'm thinking Gloria had nothing to do with the case coming back around 4 years later in the middle of Covid when creditors weren't collecting from people because they were sick and out of work, you can think again. You don't have to be a rocket scientist to understand who is who in the land of malfeasance. Gloria Gidari and Judge Suzanne Gorman just obstructed justice by telling the Court Clerk Carly to tell me I could not submit evidence of this Federal Case in my Motion that I was about to file where I was going to ask for Gorman's recusal again due to her intentional obstruction of justice and this racketeering scheme they have going on in Family Courts. The JCC refused to investigate my case when there are multiple court orders with white out on them and the Public Integrity Unit refuses to investigate it as well? So Judge Julie obscures one thing with white out (Kysa Crusco's name btw) and she is charged with 2 felonies and 2 misdemeanors, but when there are multiple court ordes with white out in cases involving Kysa Crusco, Philip Cross, and Suzanne Gorman, they refuse to investigate? Did Julie play on the wrong team or what? Did they set her up? Those are questions going through my mind right about now.

After so many years of having parents contact me while their Constitutional Rights are being violated right and left, it wears on you, especially if you are a mother and a teacher who happens to care about children. So after being diagnosed with generalized anxiety disorder and panic disorder in the 90's, I ended up having to add PTSD to the list of things I now have to deal with as a single mom in a state with no family, while I'm on permanent medical disability, trying to save my home, and everything I've worked my entire life for, while it is being stolen from me by not only my deceased ex-husband, but Kysa Crusco, Patricia Murphy, my lender Salem Five, their counsel Harmon Law Offices, and the new buyers who hijacked my private insurance after they hijacked my house. These people are now lying and trying to make it appear as though I'm jumping from court to court, but that is not what happened.

I didn't realize my own counsel (divorce attorneys who represented me in the mediation fiasco) were involved in the Real Estate Fraud deal until July 2022. That is when I went scrambling to Probate and Superior Court to block the sale of the house until I could get a trial to explain what happened with the Quit Claim Deed. After going through the run around with Sherry Bisson and another clerk in Probate Court, I tried to get help in Superior Court. They didn't even grant me an evidentiary hearing. At the same time, I filed a restraining order in Federal Court because these are violations of the Constitution of the United States and they are being covered up in the lower courts! I though the Federal Motion was denied, but it was only denied in part. The emergency part was the thing that was denied and I thought the entire Motion was denied, so I dropped it. Then I received a letter about having people served that I didn't understand. That is when I learned about my mistake and requested additional time to amend my complaint and have everyone served because by then my house had been sold in a fraudulent auction while there was a pending Motion in Federal Court, Probate Court, and Superior Court in regards to my marital residence.

After I filed the amendment and the Motion for additional time that was GRANTED, I became very sick with a defective gallbladder and I was being targeted by Kysa Crusco's bogus stalking petition and the bogus criminal harassment charge that the NBPD conjured up after I was taking photos of their lobby surveillance audio system as it was being replaced for evidence in a future lawsuit against the NBPD and the Town on behalf of my daughter. I had a very difficult time find Patricia Murphy's address and I'm still not sure if I have the correct one. I had it served by the Sheriff's office and then the woman who got served called and told me it wasn't for her, so now I have to investigate that issue. It's difficult to find Philip Cross, so I need additional time to research which district he is in and when because I'm hearing he's also a professor at UNH and is on the ethics committee, I kid you not.

I finally consulted with a Real Estate attorney who charges $500 an hour just to speak to you. He is in another state, but confirmed that I was being abused by the judicial system all along and these people are all stealing my home from me by intentionally making a false claim when the Quit Claim deed shoud have been returned to the Goffstown Courthouse when Patricia A. Muprhy retire. That is why I sent a letter to the Hillsborough County Registrar's Office to request they return the quit claim deed. They did not comply with my request, so my house was sold at auction and I was denied due process. This is all happening because because attorneys Mark Campbell, Mitch Utell, Kysa Crusco, Patricia Murphy, Jim Ogorchock, along with my husband bullied me in mediation to close the deal and make a quick buck and I was under such extreme duress from the threat of having my child taken from me, that I'm surprised I didn't die from a heart attack, it's been that stressful for ten years.

They (Patricia Murphy and others) helped James Reid Coburn commit Real Estate Fraud by giving him back the deed to fraudulently register back in January 2015, when it was COURT ORDERD to be held in escrow until he refinanced or sold our home for my protection. Then he tried to force me into bankruptcy because they colluded and put language in there to allow that, just in case. Then when that didn't work, he was just going to ride it out until the judge ordered him to sell it and that wasn't going to happen when it should have happened because

Judge Suzanne Gorman was protecting him instead of me. That's just the way they do business in Goffstown and it's totally illegal. That is why my attorney never filed a plea of title and then tried to gaslight me into believing I was crazy and didn't know the law. That is also when Mitch Utell and Mark Campbell failed to inform the judge that I was making the payments on my loan, but ended up having health issues and there was a past due child support arrearage of approximately $9k. I am not made of money and $9k is a lot of money when you make less than $50k a year. I had HAF all ready to help me with approximately $40k to get my home back, but it was stolen from me before I could tell the Courts with evidence, what is really going on here.

With that said, I fell I have provided enough evidence to warrant an evidentiary hearing in regards to this Real Estate Fraud issue and I need extra time to have Patricia Murphy and Philip Cross served. I've already spent thousand trying to track down these people and in service fees since July.

sexually molested after it had already been verified by the CAC, the State Police, and DCYF that she had been molested by another child at my husband's house because he was not properly supervising them. There were many other things that Kysa should have investigated and didn't, and those children should have been properly supervised and never left alone the way they were. They were 5, 6, and 8. My ex-husband Jim Coburn, left them alone in the pool one time too and the child who was molesting my child didn't know how to swim, so her older brother ratted my ex-husband out to his father (who is a fireman from Hooksett FD on medical disability right now being targeted by none other than Kysa Crusco who is representing his wife and messing with his parental rights). You can't even make this stuff up! I am now friends with the father of the child who molested my child and he knows his child molested my child and agrees what she was doing was wrong and is sick over the fact that DCYF didn't investigate whether or not his child was possibly molested and acting it out on my child, which is what my therapists felt was happening and Linda Bagshaw thought was happening. Linda Bagshaw said to me, "There is not doubt in my mind that other child has been molested." The child told my child that an older boy had kissed her privates in a bathroom. She kept trying to watch my child go to the bathroom and it made my child uncomfortable. Every time my child went into the bathroom, this child would try to go in there with her and look at her private area. They were 5 and 6 and I used to teach Kindergarten and First grade. It was not normal let's play doctor exploratory child play.

After the bathroom issues, the child convinced my child to get undressed under a gateleg table in the kitchen while James Reid Coburn was upstairs working. He had an office in the upstairs back corner of a 3500 square foot house and he allowed those children to play all day unsupervised. When the child convincd my daughter to get undressed she then told my child to pretend that animals and/or people were poking their private area and she inserted her fingers in my daughter's vagina. My daughter did not want her to do that and my child was afraid to tell her father and me for a long time. When she finally told me and I reported it to my attorney, we had to go around the NBPD to get it investigated properly by the CAC. The CAC interviewed both children and the State Trooper watched the videos. Both children admitted what happened and they were told about good touch bad touch and instructed not to do it again. DCYF marked it

Page 9

unfounded as neglect against my husband because it was the first time he was caught leaving them unsupervised and I was not going to charge a little kid who was possibly being molested for what she was doing to my child.

I am a survivor of sexual abuse too and I was raised by a pedophile who preyed on my mom's sister when she was 13, then went after my best friend when I was in 3rd grade, and then finally went to jail for going after my step-sister's child almost 40 years after he had "supposedly" gotten rid of his demons in therapy. He spent 6 years in prison and he was around 78 when he was arrested for the first time and prosecuted. What a path of destruction those types leave in their path, my God!

If anyone wants to understand how sociopaths and pedophiles and pedophiles who are sociopaths groom and prey on people, I could write novels, trust me. I am not your average mom with basic life experiences, I can tell you that.

I would like this document to be kept confidential as there is a great deal of sensitive information and I need to protect my minor child.

Rochelle Pouget
Pro se                    *Rochelle Pouget*          5/31/23
20 Lincoln Drive
New Boston, NH 03070


This document was signed before me on 5/31/23.

*Michael Sindoni*

**MICHAEL R SINDONI**
NOTARY PUBLIC
**State of New Hampshire**
**My Commission Expires**
**May 4, 2027**



Page 10

MICHAEL R. SINDONI
Notary Public
State of New Hampshire
My Commission Expires
May 1, 202_





Marilyn N. Hebert
36 Larch Street
Goffstown, NH 03102

ROCHELLE POUGET
20 LINCOLN DR
NEW BOSTON NH  03070-4300

**Homeowners policy
schedule for the Allstate®
Easy Pay Plan**

Information as of January 29, 2022

Policyholder                    Page **1** of 2
**Rochelle Pouget**

Policy number
**984 363 392**

Your policy provided by
**Allstate Property and Casualty Ins Co**

Covered property
**20 LINCOLN DR
NEW BOSTON NH 03070-4300**

Your Allstate agency is
**Marilyn N. Hebert**
(603) 627-9535

# Automatic installment schedule

The following payments will be credited to your policy on the dates shown below and the funds
can be withdrawn from your bank account as early as the next business day:

| February 2022 | March 2022 | April 2022 | May 2022 | June 2022 | July 2022 |
|---|---|---|---|---|---|
| 18th | 18th | 18th | 18th | 18th | 18th |
| $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |

| August 2022 | September 2022 |
|---|---|
| 18th | 18th |
| $0.00 | $71.47 |

Each payment includes a $1.50 installment fee.

NOTE: A $10.00 late fee may be assessed if payment is received after the due date.

**Remember** - Any changes you make to your policy may result in a change in premium.

# What you should know

We recently made a change to your policy that caused your premium
to be adjusted.  This change and your adjusted premium are reflected
on your current Policy Declarations.

If you have any questions, please contact your agent.
**IMPORTANT NOTICE:** PLEASE KEEP THE SCHEDULE ON THIS
NOTICE SO YOU KNOW THE UPCOMING WITHDRAWAL DATES
FOR THE REMAINDER OF THIS POLICY PERIOD.

A NEW WITHDRAWAL SCHEDULE WILL ONLY BE SENT TO YOU IF
YOUR POLICY IS RENEWED OR IF A CHANGE IS MADE TO YOUR
PREMIUM AMOUNT OR DATE.

If you need to make a change to your bank account information
contact your Allstate Representative or call 1-800-Allstate®  and
complete a new application.

If you wish to be removed from the Allstate Easy Pay Plan contact your
Allstate Representative or call 1-800-Allstate® . Please allow 5
business days to stop your deductions.

*(continued)*





Page  1 of  8

Homeowners policy schedule for the Allstate® Easy Pay Plan                           Page **2** of 2

Policy number: | **984 363 392** |

Effective date:   **October 19, 2021**

Agency:          Marilyn N. Hebert
                 (603) 627-9535

**Please do not remit a check to us while on the Allstate Easy Pay Plan.**

## Transaction history

| Date | Transaction | Amount | Balance |
|------|-------------|--------|---------|
| 11/27/21 | Previous Balance | | $644.26 |
| 11/29/21 | Payment received - mortgage company | - 644.26 | 0.00 |
| 1/6/22 | Policy change | + 69.97 | 69.97 |
| **Balance (to pay in full)** | | | **$69.97** |

Page 2 of 8

 **Allstate.**

Allstate Property and Casualty Ins Co
PO Box 660649
Dallas, TX 75266-0649

# Homeowners policy bill

Information as of September 16, 2022

Policyholder                    Page **1** of 2
**Rochelle Pouget**

Policy number
**984 363 392**

Your policy provided by
**Allstate Property and Casualty Ins Co**

SALEM FIVE MORTGAGE COMPANY LLC   ITS SCRS &/OR
ASSIGNS ATIMA
PO BOX 700697
DALLAS TX  75370-0697

Covered property
**20 LINCOLN DR**
**NEW BOSTON NH 03070-4300**

Policy period
Effective **October 19, 2022** through
**October 19, 2023** 12:01 a.m. standard time

Your Allstate agency is
**Marilyn N. Hebert**
36 Larch Street
Goffstown, NH 03102
(603) 627-9535

| To pay in full amount due by October 6, 2022 | $2,707.81 |
| --- | --- |

## Transaction history

| Date | Transaction | Amount | Balance |
| --- | --- | --- | --- |
| 7/28/22 | Previous Balance | | $23.64 |
| 8/29/22 | Renewal premium | + 2,684.17 | 2,707.81 |
| **Balance (to pay in full)** | | | **$2,707.81** |

You will not be sent a bill until your policy renewal.



**How to save with Allstate**

We're always here to help.
For more ways to save[1] – like Full
Pay, Drivewise® or Easy Pay – log in
to the Allstate® mobile app or
allstate.com/myaccount.

[1]Subject to terms, conditions and availability.

Detach bottom portion here ▼

----

# Return this portion with your payment                10/19

 **Allstate.**

| To pay in full amount due by October 6, 2022 | $2,707.81 |
| --- | --- |

Policyholder
**Rochelle Pouget**

Policy number
**984 363 392**

**Amount enclosed**

$                    .

*Make check or money order
payable to Allstate Property and
Casualty Ins Co. Please include
your policy number. Allow five
days for delivery.*

ALLSTATE PROPERTY AND CASUALTY INS CO
PO BOX 660649
DALLAS TX 75266-0649

*Do not write address or policy
change requests on this return
portion, contact your agency.*



/0650700289000000984363392101960270781800000000002707818/

Page 3 of 8

Homeowners policy bill
Policy number: **984 363 392**
Effective date: **October 19, 2022**
Agency:        Marilyn N. Hebert
               (603) 627-9535

Page 4 of 8

 **Allstate.**

Allstate Property and Casualty Ins Co
PO Box 660649
Dallas, TX 75266-0649

# Homeowners policy bill

ꞮꞮꞮꞮꞮꞮꞮꞮꞮꞮꞮꞮꞮꞮꞮꞮꞮꞮꞮꞮꞮꞮꞮꞮꞮꞮꞮꞮꞮꞮꞮꞮꞮꞮ

SALEM FIVE MORTGAGE COMPANY LLC ITS SCRS &/OR
ASSIGNS ATIMA
PO BOX 700697
DALLAS TX 75370-0697

Information as of November 16, 2022

Policyholder
**Rochelle Pouget**

Page **1** of 2

Policy number
**984 363 392**

Your policy provided by
**Allstate Property and Casualty Ins Co**

Covered property
**20 LINCOLN DR**
**NEW BOSTON NH 03070-4300**

## To pay in full amount due by December 6, 2022     $23.64

Policy period
Effective **October 19, 2022** through
**October 19, 2023** 12:01 a.m. standard time

## Transaction history

| Date | Transaction | Amount | Balance |
|------|-------------|--------|---------|
| 9/16/22 | Previous Balance | | $2,707.81 |
| 10/6/22 | Payment received - mortgage company | - 2,684.17 | 23.64 |
| **Balance (to pay in full)** | | | **$23.64** |

You will not be sent a bill until your policy renewal.

## What you should know

The **Minimum Amount Due** includes a Past Due Amount of $23.64.
If you have any questions, please contact your agent.

Your Allstate agency is
**Linda Nutter Krantz**
3 Orchard View Dr. #
Londonderry, NH 03053
(603) 437-6800



### How to save with Allstate

We're always here to help.
For more ways to save[1] – like Full
Pay, Drivewise® or Easy Pay – log in
to the Allstate® mobile app or
allstate.com/myaccount.

[1]Subject to terms, conditions and availability.

---

*Detach bottom portion here ▼*

## Return this portion with your payment    10/19

## To pay in full amount due by December 6, 2022     $23.64

**Amount enclosed**

$      .

Make check or money order
payable to Allstate Property and
Casualty Ins Co. Please include
your policy number. Allow five
days for delivery.

ꞮꞮꞮꞮꞮꞮꞮꞮꞮꞮꞮꞮꞮꞮꞮꞮꞮꞮꞮꞮꞮꞮꞮꞮꞮꞮ
ALLSTATE PROPERTY AND CASUALTY INS CO
PO BOX 660649
DALLAS TX 75266-0649

 **Allstate.**

Policyholder
**Rochelle Pouget**

Policy number
**984 363 392**

*Do not write address or policy
change requests on this return
portion, contact your agency.*



/065070028900000098436339210196000236480000000000023648/

Page 5 of 8

**Homeowners policy bill**
**Policy number:** **984 363 392**
**Effective date:** **October 19, 2022**
**Agency:** Linda Nutter Krantz
                (603) 437-6800

065.070.028
22116303085A
EBCR19CW22111619164479205A-001839-001-0-02-14

Page 6 of 8



Allstate Property and Casualty Ins Co
PO Box 660649
Dallas, TX 75266-0649

# Homeowners policy bill

SALEM FIVE MORTGAGE COMPANY LLC   ITS SCRS &/OR
ASSIGNS ATIMA
PO BOX 700697
DALLAS TX 75370-0697

Information as of January 16, 2023

Policyholder                    Page **1** of 2
**Rochelle Pouget**

Policy number
**984 363 392**

Your policy provided by
**Allstate Property and Casualty Ins Co**

Covered property
**20 LINCOLN DR
NEW BOSTON NH 03070-4300**

Policy period
Effective **October 19, 2022** through
**October 19, 2023** 12:01 a.m. standard time

Your Allstate agency is
**Linda Nutter Krantz**
3 Orchard View Dr. #
Londonderry, NH 03053
(603) 437-6800

## To pay in full amount due by February 6, 2023    $23.64

## Transaction history

| Date | Transaction | Amount | Balance |
|------|-------------|--------|---------|
| 11/16/22 | Previous Balance | | $23.64 |
| **Balance (to pay in full)** | | | **$23.64** |

You will not be sent a bill until your policy renewal.

## What you should know

The **Minimum Amount Due** includes a Past Due Amount of $23.64.
If you have any questions, please contact your agent.



### How to save with Allstate

We're always here to help.
For more ways to save¹ – like Full
Pay, Drivewise® or Easy Pay – log in
to the Allstate® mobile app or
allstate.com/myaccount.

Subject to terms, conditions and availability.

*Detach bottom portion here ▼*

## Return this portion with your payment    10/19



## To pay in full amount due by February 6, 2023    $23.64

Policyholder
**Rochelle Pouget**

Policy number
**984 363 392**

*Do not write address or policy
change requests on this return
portion, contact your agency.*

**Amount enclosed**

$ _____ .

Make check or money order
payable to Allstate Property and
Casualty Ins Co. Please include
your policy number. Allow five
days for delivery.

ALLSTATE PROPERTY AND CASUALTY INS CO
PO BOX 660649
DALLAS TX 75266-0649



/0650700289000000984363392101960002364800000000000023648/

Page 7 of 8

Homeowners policy bill
Policy number:   984 363 392
Effective date:  **October 19, 2022**
Agency:          **Linda Nutter Krantz**
                 **(603) 437-6800**

065 070 028
230116202232A
EBCR19CWZ30116I9434730SA-001064-001-0-02-14

Page 8 of 8

NOTICE: This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press. Errors may be reported by e-mail at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: http://www.courts.state.nh.us/supreme.

THE SUPREME COURT OF NEW HAMPSHIRE

———————————

Hillsborough-southern judicial district
No. 2017-0008

SAN-KEN HOMES, INC.

v.

NEW HAMPSHIRE ATTORNEY GENERAL, CONSUMER PROTECTION AND ANTITRUST BUREAU

Argued: January 25, 2018
Opinion Issued: October 16, 2018

Bernstein, Shur, Sawyer & Nelson, P.A., of Manchester (Michael A. Klass on the brief, and Gregory E. Michael orally), for the plaintiff.

Gordon J. MacDonald, attorney general (John W. Garrigan, assistant attorney general, on the brief and orally), for the defendant.

HANTZ MARCONI, J. The plaintiff, San-Ken Homes, Inc. (San-Ken), appeals a decision of the Superior Court (Ignatius, J.) requiring it to apply for registration or exemption with the defendant, New Hampshire Attorney General, Consumer Protection and Antitrust Bureau (Bureau), under the Land Sales Full Disclosure Act (Act), and to make certain improvements to Old Beaver Road in the Oakwood Common subdivision in New Ipswich. See RSA ch. 356-A (2009 & Supp. 2017). We reverse.

I

For context, we provide a brief overview of the provisions of the Act.  The purpose of the Act is to "prevent fraud in the sale of house lots in the State." N.H.S. Jour. 373 (1970).  In furtherance of that purpose, a subdivider of subdivided land of more than 15 lots may not offer or dispose of any lot before the subdivided lands are registered with the Bureau.  See RSA 356-A:3, I(a), :4, I (2009).  A "subdivider" is "a person who is an owner of subdivided land or one who offers it for disposition.  Any successor of [a subdivider] who comes to stand in the same relation to the subdivided lands as his predecessor did shall also come within this definition . . . ."  RSA 356-A:1, V (2009).

A subdivider must register subdivided land by submitting an application to the Bureau.  See RSA 356-A:5 (Supp. 2017).  Upon receipt of an application for registration, the attorney general must initiate an examination to determine whether, inter alia, "there is reasonable assurance that all proposed improvements will be completed as represented," including "evidence of adequate funds to complete any infrastructure, such as roads."  RSA 356-A:7, I(b) (Supp. 2017).  The attorney general must also determine whether the "general promotional plan is not false or misleading . . . and affords full and fair disclosure."  RSA 356-A:7, I(c) (2009).

The Act allows for exemptions from registration under certain circumstances.  The Act "shall not apply" to an offer or disposition of subdivided land of not more than 15 lots.  RSA 356-A:3, I(a).  In addition, a subdivider of subdivided land of no more than 50 lots may apply for an exemption from the registration and annual reporting requirements.  RSA 356-A:3, I-a(a) (Supp. 2017).  Such a subdivider "shall be entitled to an exemption" if certain conditions are met.  RSA 356-A:3, I-a(b) (Supp. 2017).  Further, the attorney general may exempt from any of the provisions of the Act any lots in a subdivision "if it finds that the enforcement of all of the provisions of [the Act] with respect to such . . . lots . . . is not necessary in the public interest and for the protection of purchasers" because of the "small amount involved or the limited character of the offering, or because such property, in the discretion of the attorney general, is otherwise adequately regulated" by town ordinances or state or federal statutes.  RSA 356-A:3, II (2009).

"If, subsequent to the issuance of an exemption from registration . . . the bureau has reasonable grounds to believe that exemption in the particular case is not in the public interest, the bureau shall . . . revoke the exemption."  N.H. Admin. R., Jus 1305.03(a).  Grounds for revocation shall include the insolvency of the subdivider.  N.H. Admin. R., Jus 1304.03(b)(3).

The attorney general may bring an action in superior court "[i]f it appears that a person has engaged in or is about to engage in an act or practice constituting a violation of" the Act.  RSA 356-A:10, III (2009).  The attorney

general may issue a cease and desist order, RSA 356-A:12, I (2009), or revoke a registration, RSA 356-A:13, I (2009).

In addition, any time the attorney general has "reasonable cause" to believe that the subdivider may be unable to complete the development, it may require the subdivider to "provide evidence of financial security" to assure the completion of the development, and any person aggrieved by the subdivider's failure to complete the development "may proceed on such bond . . . to recover damages." RSA 356-A:5, VI (Supp. 2009). Furthermore, "[a]ny subdivider who disposes of any lot . . . in subdivided lands in violation of [the Act] or who in disposing of any lot . . . makes an untrue statement of a material fact, . . . or omits a material fact . . . , is liable to the purchaser of such lot," RSA 356-A:16, I (2009), and "[a]ny purchaser, who is eligible for relief" may bring an action for injunction and other specified damages, see RSA 356-A:16, II (2009). The attorney general may intervene in any suit alleging a violation of the Act. RSA 356-A:10, IV.

II

The record supports the following facts. Oakwood Common is a 16-lot subdivision originally developed by 112 Chestnut Street, LLC (112 Chestnut). In June 2006, the New Ipswich Planning Board (Board) approved the subdivision, conditioned on 112 Chestnut paving to Town standards Old Beaver Road — the single road providing access to the subdivision's lots from the adjacent public way.

In August 2006, 112 Chestnut applied to the Bureau for a certificate of exemption from registration under the Act. In its application, 112 Chestnut represented that the "roadway servicing the subdivision ('Old Beaver Road') shall be constructed by [112 Chestnut] and held as a private way by the future owners of the Lots." The application stated that the subdivision would be constructed and completed in two phases: phase I, consisting of six lots "and attendant road work," to be completed by September 2006; and phase II, consisting of 10 lots "and attendant road work," to be completed by December 2007.

112 Chestnut established an irrevocable letter of credit to "guarantee completion of construction of [the] road . . . according to the specifications as shown" on the subdivision plan. 112 Chestnut stated that the letter of credit had been posted with the Town as assurance to secure the completion of the promised road improvement. Additionally, 112 Chestnut stated that, although the total cost of the promised improvement was not fully covered by the assurance, "a second Irrevocable Letter of Credit [would] be posted upon commencement of Phase II." The purchase and sale agreement included with the application provided that 112 Chestnut "shall have the obligation, which

3

obligation shall survive the delivery of the deed to BUYER, to have installed upon the Premises . . . a private roadway."

In October 2006, the Bureau granted a certificate of exemption to 112 Chestnut "as to the offer and sale of" the 16 lots "because of the limited character of the offering and because the subdivision is adequately regulated by municipal ordinances." See RSA 356-A:3, II.  112 Chestnut constructed the road but, contrary to the promise it made, the road did not meet the Town's required paving standards.  After 112 Chestnut developed and conveyed seven lots within the subdivision to third parties, it defaulted on its mortgage, and TD Bank, N.A., the mortgagee, foreclosed on the remaining nine lots.  For reasons that are unclear on the record, the irrevocable letter of credit posted with the Town to assure completion of Old Beaver Road as promised by 112 Chestnut expired.

In June 2014, San-Ken, which has no relationship to 112 Chestnut, purchased the remaining nine undeveloped lots from the bank at a foreclosure sale and recorded title to the property.  In August 2014, San-Ken's application to the Town for a building permit was denied, based upon a recommendation from the Board "that no further building permits be approved for the Old Beaver Road subdivision until such time as a road bond is posted or the road is completed."  At an August hearing before the Board, the Board's chair suggested that San-Ken "work[ ] with the homeowners with a plan for modifying the subdivision plan for road standards that [could] be met in time certain, and the Board [would] consider the modification."

On September 3, the Board held a hearing on San-Ken's application for modification of the Board's original conditions for Old Beaver Road.  As an alternative to the Board revoking the subdivision approval, Town counsel recommended that it entertain a motion to waive the prior road completion requirements and specifications on the condition that San-Ken complete certain improvements to the road at its own expense.

At a September 17 hearing, the Board unanimously approved a modification of the original subdivision approval for Oakwood Common by replacing the previous conditions in their entirety with five "clarifications and conditions" including:

2.  The existing road constructed within the subdivision (with one course of asphalt), is satisfactory as a private road, with no second asphalt course required, subject to the following improvements to be performed within 90 days from the date of this approval by and at the expense of the owner of the 9 remaining unimproved lots in the subdivision (presently San-Ken Homes, Inc.):

4

- fix cracks by cleaning and filling
- seal coat the entire road
- repair all potholes[.]

Shortly thereafter, San-Ken completed the sealing and the pothole and crack repairs, thus satisfying all of the Board's requirements.  In November, San-Ken applied for a certificate of exemption from registration.  <u>See</u> <u>N.H. Admin. R.</u>, Jus 1304.07.  In a December letter, the Bureau stated:

> It is the Bureau's position that the rules obligate the subdivider to provide for the completion of the roadways to established local standards.  The planning board's decision does not serve to modify those established standards.  Rather, it merely reflects the planning board's decision not to require that a road bond be in place as a precondition to the issuing of building permits.  Such a decision neither alters the regulatory requirements set out in Jus 1304.07, nor requires the Bureau to ignore the clear language of the rule.
>
> The original subdivider met its obligations to bond the completion of the roadway to local standards, absent which, the Bureau would not have issued the certificate of exemption.  All those who have purchased homes in the Oakwood Common subdivision did so under the understanding that the purchase price included funds for the completion of the roadways to established town standards.  It is fundamentally unfair for [San-Ken] to now seek to both reduce the standards to which the roadways will be constructed and then require the current homeowners to pay more money to complete the roadways to those lower standards.

(Footnote omitted.)  Accordingly, the Bureau indicated that it would require San-Ken to pave the road to the original specifications promised by 112 Chestnut and approved by the Board in 2006.  San-Ken disagreed with the Bureau's position but, in order to market its lots, it applied for an exemption "without prejudice and reserv[ing] all rights, defenses, and other claims including but not necessarily limited to" whether San-Ken is the successor subdivider, whether it is required to register its nine lots, and whether it is obligated to further improve the subdivision's road.

Thereafter, as part of an escrow agreement with the Bureau, San-Ken obtained a performance bond to guarantee completion of Old Beaver Road to specifications set forth in the escrow agreement in the event that San-Ken's instant appeal proved unsuccessful.  The Bureau issued a certification of exemption in May.

San-Ken appealed to the trial court.  San-Ken asserted that the Bureau lacked authority under the Act to require it to be registered or exempted, and to require it to make improvements to Old Beaver Road.  Following a bench trial, the trial court found that "San-Ken's purchase of 9 of the 16 lots, [its] application . . . for building permits, negotiations with the Board for some improvements to Old Beaver Road, and commitment to create a homeowners association . . . [were] sufficient to demonstrate that San-Ken has come 'to stand in the same relation to the subdivided lands as [its] predecessor did.'"  However, the court found that the Bureau had "no authority . . . to disregard and countermand the Board's modification of the original road standards."

The Bureau moved for partial reconsideration.  The trial court reversed its original decision in part, finding that the Bureau was "within its authority under RSA 356-A to require the successor subdivider San-Ken to complete Old Beaver Road to the original specifications" and that, although the original seven purchasers "could have, and perhaps should have, appealed the Planning Board's 2014 modification, that failure to appeal [did] not obviate the authority of the Bureau to enforce the subdivision commitments made during the regulatory process."  This appeal followed.

III

On appeal, San-Ken argues that the trial court erred in: (1) applying a mistaken standard of review; (2) finding San-Ken to be a successor subdivider under the Act; and (3) determining that the Bureau was within its authority to require San-Ken to further improve Old Beaver Road as a condition of obtaining a certificate of exemption.

Resolving these issues requires that we engage in statutory interpretation.  We are the final arbiter of the legislature's intent as expressed in the words of the statute considered as a whole.  See Woodview Dev. Corp. v. Town of Pelham, 152 N.H. 114, 116 (2005).  We first examine the language of the statute, and, where possible, ascribe the plain and ordinary meanings to the words used.  Id.  When a statute's language is plain and unambiguous, we need not look beyond it for further indication of legislative intent, and we will not consider what the legislature might have said or add language that the legislature did not see fit to include.  Id.  We construe all parts of a statute together to effectuate its overall purpose and avoid an absurd or unjust result.  Appeal of Local Gov't Ctr., 165 N.H. 790, 804 (2014).  Moreover, we do not consider words and phrases in isolation, but rather within the context of the statute as a whole to enable us to interpret statutory language in light of the policy or purpose sought to be advanced by the statutory scheme.  Id.  We apply the same principles of construction in interpreting administrative rules.  Appeal of Town of Pittsfield, 160 N.H. 604, 606 (2010).  We review the trial court's interpretation de novo.  See Appeal of Local Gov't Ctr., 165 N.H. at 804.

For purposes of this appeal, we assume without deciding that San-Ken, by purchasing nine lots in subdivided land from a bank at a foreclosure sale, became a "subdivider" within the meaning of the Act.  However, we disagree that San-Ken is a successor subdivider of 112 Chestnut.

The Bureau contends that under its authority to "protect purchasers" by assuring that "promises made by subdividers are kept," the "only way for consumer protection laws to be effective is by expressly not allowing bad actors opportunities to circumvent them."  (Quotation omitted.)  Thus, the Bureau argues, because 112 Chestnut "promised the original seven homebuyers that it would build the subdivision road to the full town standards," the Bureau has the regulatory authority to require San-Ken to complete the road.  The Bureau asserts that San-Ken, "[f]or all intents and purposes . . . has picked up where the previous subdivider left off and stands in the exact same shoes as [112 Chestnut] at the time of the foreclosure."

Neither the Act's purpose or plain language nor the regulations support the Bureau's position.  As set forth above, the purpose of the Act is to "prevent fraud in the sale of house lots."  N.H.S. Jour. 373 (1970).  In furtherance of that purpose, the provisions of the Act and its regulations operate prospectively to protect potential purchasers of homes in subdivided land.  Each application for registration or exemption under the Act is personal to the particular subdivider, including a successor subdivider.  As the rules provide, "[a]ny person who comes to stand in the same relation to the subdivision as the original subdivider shall be required to make separate application to the bureau for registration as a successor subdivider."  N.H. Admin. R., Jus 1306.19(a).  An exemption may be granted only as to those lots in the subdivision that, at the time the application is filed, the subdivider owns.  See N.H. Admin. R., Jus 1304.07(a)(5)a.

San-Ken applied for an exemption for the nine lots it owns in the Oakwood Common subdivision.  Under the regulations, San-Ken's obligations under the Act operate prospectively to future home buyers of the nine lots it purchased at the foreclosure sale.  Thus, we reject the Bureau's position that San-Ken stands "in the exact same shoes" as 112 Chestnut, as San-Ken never owned any of the seven lots developed by 112 Chestnut, nor did it have any relationship with 112 Chestnut.

 We acknowledge that 112 Chestnut promised to the seven original home buyers in Oakwood Common that it would complete Old Beaver Road to Town standards and it obtained an irrevocable letter of credit to assure its completion; however, it did not fulfill its promise to complete Old Beaver Road.  The Act sets forth remedies available to the attorney general to ensure that subdividers complete developments as promised, as well as remedies available to consumers who purchase lots in subdivided land.  However, there is no provision in the Act that allows the Bureau under the circumstances presented

to bind San-Ken to promises made by 112 Chestnut and we will not add language to the statute that the legislature did not see fit to include.

We conclude that the trial court erred as a matter of law in finding that the Act authorized the Bureau to require San-Ken to complete Old Beaver Road to the standard promised by 112 Chestnut as a condition of obtaining a certificate of exemption. Accordingly, we need not address the remaining issues raised.

<u>Reversed</u>.

LYNN, C.J., and HICKS and BASSETT, JJ., concurred.

Rochelle Coburn                                              Phone: 603-325-5874
1030 Shirley Avenue                                          Email: rockyp88@comcast.net
Goffstown, NH 03034

February 17, 2014

To: Guardian Ad Litem Board
Re: Formal Complaint

To Whom it May Concern:

Please find enclosed a formal complaint against Guardian Ad Litem, Kysa Crusco

Kysa Crusco was assigned to case number: 638-2012-DM-00098 on July 28, 2013.

I, Rochelle Coburn, would like the GAL board to be aware that:
Kysa made a false statement in regards to her time spent with me.
Kysa waited six months to interview my daughter about the abuse she reported
Kysa interviewed Danielle at Jim's house, rather than a neutral location
Kysa has yet to interview the nurse practitioner or DCYF investigator who spoke with my daughter
Kysa made a false statement about my willingness to participate in counseling
Kysa reported false statements about my mental health
Kysa made a false statement about my troubled marriage and omitted important information
Kysa failed to read important documentation provided to her in October and/or chose not to report anything about my husband's mental health issues
Kysa omitted important information regarding my nolle pros agreement and failed to provide any information about the numerous restraining orders. my husband attempted to file against me, that were all denied
Kysa continued to harass me by sending me several emails after I ended a phone call with her and requested that she speak to my attorney
Kysa omitted important information about my position on custody
Kysa made a false statement in regards to a situation that occurred on Halloween
Kysa filed a preliminary report without notifying anyone that her certification had expired and that she had not completed her complete application to obtain recertification.
Kysa requested extensions in this case, as she worked to promote her private practice by making lengthy videos and blogs to post on youtube and her website.

I, Rochelle Coburn, would like the board to be aware of the following:
I sent in my questionnaire on our before October 2, 2013. In the questionnaire, I requested that Kysa interview Jim's brother Tom Coburn, and Jim's son (Derek Coburn) from a previous marriage. In addition, I requested (via email) that Kysa interview Jim's first wife (Rachelle Smith). I provided Kysa with Rachelle Smith's email and home address on November 1, 2013. Kysa did not send out a questionnaire to Tom or Derek, when she sent questionnaires to the rest of the people I listed (my family and friends). Kysa did not provide any feedback from questionnaires or interviews from any of Jim's relatives, friends, or former wives. As far as I know, she only contacted Tom and Derek in January 2014 (approximately 6 months after she received my questionnaire).

**1. Kysa states, "The GAL met with Rochelle for over two hours on two separate occasions in October 2013."**
Kysa's statement is not factual; we did not meet for two hours on two separate occasions. I was on time for our 9:00am meeting on October 11th, 2013. Kysa showed up to the meeting twenty minutes late. Kysa's invoice reflects a one-hour meeting. In addition, I met with Kysa a second time at 3:30pm on October 28th, 2013. We met for approximately one hour. Kysa's invoice reflects a one-hour meeting. I placed a phone call from Bedford NH to my mother in California at 4:29pm and spoke with her for 28 minutes, which shows I left Kysa's office less than an hour after our scheduled meeting (Attachment A).

*When Kysa showed up, she took out a notepad, asked me to tell her about my relationship with Jim (starting at the beginning), and yawned several times. She did not ask any questions about my concerns for my daughter's safety and wellbeing.

**2. Kysa states, "The GAL met with Dani in January 2014 in Dani's bedroom at Jim's home."**
Kysa was assigned to this case on July 28, 2013. I hand delivered my questionnaire to Kysa's office on or before October 2nd, 2013. Kysa failed to meet with Danielle, in a timely manner, to discuss the incident on March 9th, 2013, where Danielle reported that she and I were both assaulted by Jim, and that she felt like she was choking due to Jim's actions. For reasons unbeknownst to me, Kysa did not meet with my daughter, Danielle Coburn, until January 2014, approximately six months later. In addition, when my attorney and I met with Kysa on January 27, 2014, she announced she was unaware of the fact that my daughter had been seen by a nurse practitioner, a few days after the incident in March, and that the nurse practitioner contacted DCYF.

Page 1 of 16

I, Rochelle Coburn, sent the following information (via email) to Kysa on October 23rd, 2013:
"This should bring everyone up to date on my text/email exchanges with Jim.  I still have a couple of police reports to go through. I need to write up all the errors in the reporting. Also, I have the video from the police lobby, and it does confirm that Sergeant Aiken agreed with me, like I wrote in my restraining order. I have the 991 tape as well as the drawings Dani drew for the nurse practitioner as well." (Attachment B)

**3. Kysa states, "Rochelle insisted that she did not need counseling and that she could not afford to go because she did not have health insurance."**

I, Rochelle Coburn, sent Kysa the following information (via email) on December 19th, 2013:
"I have been seeing a psychiatrist for two years for anxiety and was enrolled in cognitive therapy as well. I was released from counseling over a year ago, but continued to go until my insurance was cut off. In addition, I was seeing a counselor with Jim when we first filed for divorce because I wanted to coparent Danielle in a healthy way. Jim cancelled those appointments and decided he no longer wanted to go. In addition, I suggested over the summer that we trying counseling again and he declined my request."

I, Rochelle Coburn, received the following response from Kysa (via email) on December 19th, 2013:
"I wouldn't suggest co-parenting counseling at this point. I think you should give JoAnn Cobb a call. She is at Child & Family Services. My understanding is that you have insurance now so that shouldn't be a barrier."

I, Rochelle Coburn, sent Kysa the following information (via email) on January 1, 2014:
"I've contacted Joann Cobb to see if I can get Danielle into see her, but she's not available until January 7th. I just wanted to let you know I'm working on getting her the counseling she needs. She has insurance, so I can take her as soon as Joann has an opening."

I, Rochelle Coburn, sent the following information (via email) on January 10, 2014:
There is no confusion on my part. I saw your recommendation for JoAnn Cobb and seeing that she is a Child and Family counselor, I felt it was a good idea to get Dani into counseling. I already have a counselor and the only reason I haven't been going is due to my insurance situation. Dani is insured, I am not. I can't get on my insurance plan at work until open enrollment in the Spring. I didn't enroll right away because it was too expensive and I need to be able to provide shelter and food for my family. I have been meeting with my priest for counseling because I don't have insurance and he knows Jim. I will continue to meet with him until I can get back on my insurance plan. (Attachment C)

**4. Kysa states, "Jim is concerned about Rochelle's history of mental illness, and reports that she has struggled with generalized anxiety disorder and obsessive compulsive disorder. In February 2011, she had an emotional breakdown and her medication was not helping. Jim says that she wanted to commit herself, and ended up enrolling in a 10 day intensive outpatient program."**

I, Rochelle Coburn, would like the board to know that I have never been diagnosed with Obsessive Compulsive Disorder. In addition, the releases to access to my mental health records were given to my husband's attorney over six months ago. My husband refused to sign the releases my attorney requested, so we had to address it in court on February 5th, 2013. The judge had to order my husband to sign his releases. With that said, I reported to the police, in November 2012, that my husband had an emotional breakdown in July 2012, and was seen in the emergency room two times in July 2012. One of the ER physicians instructed me to take my husband's gun away from him, as there were serious concerns that he was suicidal. Shortly after the ER visits, my husband was evaluated by a psychiatrist and put on medication for chronic depression. In addition, my husband was and/or still is, receiving therapy via The Counseling Center of Nashua. Kysa did not mention anything about my husband's mental health issues.

Instead, Kysa reported information about my mental health, based on information my husband provided, without even taking into consideration, that my husband has a long history of lying for personal gain. In addition, I provided Kysa with a very personal journal about the issues I've struggled with over the years on October 17th, 2013. The journal Kysa received included information about my son's cancer diagnosis and treatment, my father's inappropriate behavior during my childhood, and the emotional abuse I suffered, during my marriage to Jim. I was completely open and honest, despite the fact that the information I had provided was very personal and painful to reveal. Kysa never verified the information my husband provided. She did not even request that I provide access to my mental health records until December 27, 2013. Had Kysa read the journals I provided, she would have learned that I did not suffer an emotional breakdown in February 2011, as she reported. I had a series of medical issues that began in February 2011, and I was successfully treated for each one. In addition, I was struggling with anxiety, which started to creep back into my life in February 2011, but I did not want to commit myself. In July 2012, six months after the anxiety returned and the levels increased to the point where I was having back-to-back panic attacks, over a prolonged period of time, it was suggested that I enroll in a voluntary outpatient therapy program, as I was getting ready to start a new anti-anxiety medication with possible side effects. I agree to enroll in the program because I wanted to learn skills in the cognitive therapy sessions, to combat the anxiety and at the same time, have a physician on board, who would be able to provide assistance should I face any unpleasant side effects. (Attachment D)

Page 2

**5. Kysa states, "The GAL has also reviewed voluminous correspondence from the parties, most of which has come from Rochelle." In additions, Kysa states, "Rochelle has provided to the GAL massive amounts of texting that she sends to Jim, as well as some screen shots from Jim. They can be described as nothing other than a constant barrage of text messages, the vast majority of which editorialize about the things that Rochelle believes Jim is doing wrong."Kysa states, "Through the voluminous text messages exchanged between the parties, a small minority are texts sent by Jim. Although often on the receiving end of provocative texts, Jim has, for the most part, refrained from engaging Rochelle in a cyber-battle. His texts are short, many just one word answers such as "yes," "no" or "understood."  Jim's texts are to the point without editorializing. Infrequently, Jim will push back with a comment like "Your rage clouds all aspects of your life" that needles Rochelle."**

I, Rochelle Coburn, sent the following information (via email) to Kysa on October 20, 2013:
 "By now you are probably wondering why I sent so many text messages to Jim. We were barely speaking to each in the house and I was keeping my distance. I decided the only way to capture the day to day antagonistic behavior was to send him a text or email, each time it occurred. It happened so regularly, that was the best way to keep track of it. If I tried to remember it later, there was a chance I would accidentally forget about something, so I texted him each and every time, he did something to agitate me. Basically, I was using the text messages as journals, so I could show them to Ianina." I was also advised by Sergeant Aiken from the New Boston Police Department, on November 10ᵗʰ, 2012 that it would be wise to keep a journal."

I, Rochelle Coburn, received the following message (via email) from Kysa on December 10ᵗʰ, 2013:
"I've received this information and a lot of other texts/journals/emails etc. from you with communication to Jim. Do you think that the texts below and your other communication to Jim is helpful or constructive? I'd like to hear your thoughts on this, and how your communication helps Dani and coparenting with Jim."

I, Rochelle Coburn, sent the following information (via email) to Kysa on December 31, 2013:
"To answer this question, I think it is very important to be assertive when Jim purposely does something that affects the well being of my daughter. I did not make any derogatory comments in my text, just pointed out the fact that I knew what he was up too. I have put up with Jim's antics for 12 years. It's important to document the things he does, in order to show how often it happens. As I stated in a previous message, I use my text messages as my documentation because I don't always have a pen and paper handy when he does what he does to antagonize, belittle, aggravate, harass, threaten, etc. Please see the chronological list I created for you. This should make it crystal clear why I feel it's important to be assertive and stand up for my daughter and myself." (Attachment E)

Please refer to the text message exchanges and emails from September 2012 through January 2014, with special attention to the texts from February 2013, March 2013, and May 2013 (Attachment F)

**6. Kysa states, "The parties' marriage became troubled in 2012 and they went through a series of separations in June 2012 (2 weeks), July 2012 (1 month) and August 2012 (5 months) and for the last time in January 2013."**
I, Rochelle Coburn, sent the following information (via email) to Kysa on October 13, 15 and 17ᵗʰ, 2013:
Information about my relationship with Jim and our family life from 2001-2006
Information about my marriage to Jim and our family life from 2006-2010:
Information about my marriage to Jim and our family life in 2010, 2011, and 2012

Kysa received the following letter (via email) on October 11, 2013 and she chose not to reference it in her preliminary report. In the letter (written by my husband and included in this complaint), he admits our marriage had been troubled since 2005, when I informed him I wanted a divorce the first time. My husband admitted that for 6.5 years he pushed me away. Our marriage did not become troubled in 2012. It had been strained for many years and we went to marriage counseling to work through our differences before we moved to New England in 2006. I worked very hard to save our marriage, despite the fact that I was suffering a great deal of emotional that stemmed from my husband's actions.

"Working the A.A. steps, step 9 involves direct amends to people I have harmed. This letter is an attempt to make such amends to you for the hurt I have caused you on the lack of emotional connection you needed from me (other amends to come). Please accept this letter in the spirit for which it is given; to take responsibility for the pain I have caused you and to ask somewhere in the future, your forgiveness.  I am using a letter instead of talking, as I want to carefully choose my words and I don't want to screw this up. So here goes:

I have lived most of my life saying no regrets (it keeps me from admitting responsibility); it has not served me well. In reality, I have MANY regrets which are causing me great pain. After much soul-searching, mediation and prayer, I have come to terms with how I acted on emotionally connecting with you.  This is gnawing at me and I really need to get this off my chest. I want to make amends for pushing you away over the past 6 years (for me not 8.5). The last days in California were a turning point for me in the marriage. When you told me you wanted a divorce my world started to crumble.  When we were going to Charlene, everything I said about loving you and needing you was 100% true. I knew you were scared and needed me to give you emotional support and

Page 3

reassurance; I fell short of the mark. I know I was capable of giving you what you needed at the time, but the fear of you leaving now or later had taken a foothold in me. Without spiritual role models in my life, my judgment and emotional sobriety reverts back to the old ways of bad instincts and stinkin' thinkin'. Years of AA and therapy helped me see how my past behaviors wreaked havoc on those around me and yet I made a conscious decision to stop working the programs that help me curb these behaviors. I think you have come to know this, but my brain when left to it's own devices doesn't work very well.  It tells me that ones you love leave so you must protect yourself. It can override and crush my common sense, my emotions, my spirituality and pretty much anything of goodness in my life. So it was after we left California I started distancing myself from you. By keeping you at arms length, I was convinced this would ease some future emotional pain when you left (for the record it didn't work, I'm in pain). So that's when it started, as I gradually started withdrawing emotionally, I did what I do; I went inward and let my abnormal brain take charge of my life.  To help me cope, like you do with Scrabble, I doubled my efforts on what I do mechanically; job, fixing the house, dealing with crisis after crisis, anything to keep me from thinking about the perceived forth coming emotional pain.  This went well beyond just you; I shut out others, who also have an amends coming. Danielle was the exception; I felt connected to her and was probably my only lifeline to the world at large. There were times I tried to come out of my cave and connect with you but would quickly retreat at the 1st sign of emotional trouble that I wasn't prepared to handle. I believe my actions of isolating were a major cause of my depression and finally despair.  This in no way means I am blaming my actions on a disease (alcoholism or depression) nor that I don't or didn't love you; it means without an avenue to obtain spiritual growth, I lose a healthy balance in my life.  Without that balance, I reverted back to my old ways of avoiding emotional pain.  I truly became trapped, with no way out without help and too self-centered and afraid to ask for it. " (Attachment G)

**7. Kysa states, "When the meeting began, there was limited discussion about counseling until Rochelle began to raise her voice, yell at the GAL, and make disrespectful facial expressions." In addition, Kysa states, "Rochelle called the GAL condescending and said she would speak as she pleased. She threatened to call the police. Rochelle began to rampage about the abuse that Dani had suffered and questioned the GAL about issues such as when the GAL had met with Dani and what Dani had told the GAL." Kysa also states, 'The Gal still is not sure for what reason Rochelle thought she should call the police to the GAL's office."**

I, Rochelle Coburn, would like to advise the board that Kysa was extremely rude at the onset of this meeting. My attorney Janina Stodolski was present during the meeting and witnessed Kysa's unprofessional behavior. Shortly after the meeting started, Kysa asked me if I contacted Joann Cobb to set up counseling for my daughter. I misspoke by saying no, but quickly informed Kysa that had indeed contacted Joann, but that I had not heard back from her and had not set up an appointment for my daughter. After announcing that I misspoke, Kysa turned to her computer to look up an email I sent her regarding Joann Cobb. I asked Kysa, numerous times, why she was looking for the email after I acknowledged I had contacted Joann, but Kysa ignored me and kept searching for the document. My attorney and I were puzzled as to why Kysa continued to ignore me and had to intervene on my behalf.

Shortly thereafter, Kysa asked me why I felt my daughter should be seen by a psychiatrist. Knowing that we did not have much time with Kysa, I did not want to address that issue, so I asked her if she could tell me why she felt it wasn't a good idea for my daughter to be seen by a psychiatrist. Kysa did not answer my question.

My goal going into the meeting was to address several issues I had with the way Kysa was conducting her investigation. On January 10th, I sent my attorney a list of questions I wanted answered. See below for details:

Why hasn't Kysa spoken to Danielle? She was assigned to her in August.
Did she speak to or meet with Deb Downing (Danielle's daycare provider for 5 years)?
Did she speak to or meet with the nurse practitioner who called DCYF after speaking to Danielle?
Did she speak to or meet with the DCYF employee who met with Danielle?
Did she speak to Mrs. Hall Danielle's pre-school teacher?
Why did she tell Jim that she was recommending that I enroll in individual therapy? I find that unprofessional and unethical and Jim has used it against me to antagonize me.
Did she recommend that Jim enroll in individual therapy as well? If so, why hasn't she informed me? If not, why the hell not.
Why did she tell Referee Cross that she had not read the information I sent her? I spent days putting that together for her, so she would have a clear understanding of what Jim has done.
Did she receive information from Jim's brother Tom or Jim's sister in law Rosie? I put them on my list and informed her that Jim had their contact information.
Why did she call and reprimand me for going to the police in regards to Jim violating the court order and not providing adequate clothing (i.e. snow pants that fit) when specifically requested?
Why did she make the following snide remark when I informed her I felt it was necessary for Jim to provide the snow pants, since I wasn't receiving any support and she needed them for school. "What is he supposed to do, pack a suitcase each time he sends her to you?"  I find that remark highly antagonistic and unprofessional.
Why did she feel Jim made a mistake and/or didn't have time to drop off the snow pants, given his past behaviors that were clearly documented?

Page 4

Why hasn't she made an appointment with me to hear the enhanced 911 tape and the police lobby videos?

Kysa refused to answer the questions I posed during the meeting and/or changed the subject numerous times. In addition, she falsely accused me of posting negative statements about her online and said she knew it was me and that I had been doing it for months. When I informed her that she was incorrect, she continued to harass me. At that point, I questioned her about her false accusations and asked her if we needed to get the police involved for her harassment.

During the meeting, I informed Kysa that I was extremely concerned about my daughter's well being and that I had been trying to get her into counseling since March 11th, 2013. I told Kysa that the assaults on March 9th, were very traumatic for my daughter and I could not believe she had not even spoken to her until shortly before we met on January 27th. I went into detail about the assault on my daughter and told Kysa that my daughter reported the whole thing (and drew pictures) to a nurse practitioner and that I was not even in the room when she met with Danielle. Kysa, spoke up in a very condescending manner and said, "Oh really, then why didn't the nurse practitioner report anything to DCYF." I was totally shocked by Kysa's comment and said, "She did!" I then went on to inform Kysa that my daughter reported the assault to a DCYF employee as well and that I could not believe she was unaware of that, since I had provided her with the information in October.

At that point, I went on to tell her about the emotional abuse I endured during my marriage and had been told by medically trained professionals (my psychiatrist and my marriage counselor) that they felt Jim's behaviors were abnormal and could be attributed to anti-social personality disorder. I informed Kysa that I felt my husband was a sociopath and that I wanted him to have a psychiatric evaluation. I asked Kysa if she read the information I provided her with and if she read the DSM manual to gain an understanding of the symptoms of antisocial personality disorder. Kysa did not respond to that question.

When Kysa mentioned she was a mandated reporter, I informed her I was aware of that. I informed Kysa that I had a lot of experience working with children who had physical and emotional disabilities. I went on to say that I had received my bachelor's degree in Education and had worked in special education as a paraprofessional, teacher, and case manager. I informed Kysa that it was my job to observe children and write reports about their behaviors and that I had taken an interest in psychology many years ago, after working with special needs students, but did not continued my education to pursue a degree in child psychology.

Kysa repeatedly told me she would end the meeting if I continued to speak at a level she was uncomfortable with. As I stated earlier, my attorney was present and will confirm I am a passionate mother who is desperately searching for an advocate for my child who will hear HER voice and address the concerns I have about her safety. I am assertive and will not tolerate being lied to, bullied, or harassed by anyone, including the police. My approach at handling my frustrations with the lies and manipulation my husband has been getting away with may not be perfect, but at no time have I raised my voice to a level that would be considered threatening in any way. I am upset, but I feel I have a right to be upset and I will not be silenced until the truth is revealed and the proper steps are taken to protect my daughter. (Attachment H)

**8. Kysa states, She entered into an agreement to conditionally no-process the charges with conditions that included that she would be of good behavior, not commit any felony, misdemeanor or major motor vehicle violations and that she would only have contact with James Coburn for child care and parenting issues."**

Kysa omitted important information in regards to the nolle pros agreement. Please refer to the attached copy of the agreement. I have reason to believe my husband provided Chief Brace with a list of conditions he wanted him to include in the nolle pros, to gain an advantage in our divorce, and keep me out of the house. (Attachment I)

**9. Kysa states, "Chief Brace relayed that the New Boston Police Department has, in an official capacity, been dealing with the Coburn family for about 14 months. During that time, Jim has not initiated contact with the police except during extreme circumstances. Jim has also never filed a complaint or asked to press charges. On the other hand, Chief Brace reports that Rochelle has sought out the police for issues ranging from snow pants to personal property to allegations of domestic violence against Jim."**

Chief Brace is incorrect. My husband contacted the police on January 3rd, after he assaulted me, because I screamed for my son to help me. My husband knew my son was going to call 911, so he quickly called them first and reported that I was out of control and broke a lamp. The lamp was broken earlier that morning and was already cleaned up before my husband assaulted me. It had nothing to do with the assault and my husband admitted he was not in the room when it broke.

In April 2013, my husband contacted the police in regards to a phone call that he received when I had bail conditions. My son had contacted my husband after he learned that I was at a move theater with Danielle and she wanted to stay to see the last 15 minutes of the movie. I had miscalculated the length of the movie and would be late for my exchange if we stayed. Danielle had tried to call her father from my phone, but he did not answer. My husband spoke to the police and asked if that would be considered a violation of my bail conditions.

Page 5

In May 2013, my husband put up no-trespassing signs on my property and called the police to have me arrested for trespassing. I was dropping my daughter off at the location specified in our interim agreement, and my husband was incensed. Due to the fact that I would not cower to his demands, he contacted the police.

My husband contacted the police in regards to a Home Depot account that I closed. I was advised in mediation to close all joint accounts, and did not realize I had been removed as an authorized user on the card already.

In June 2013, my husband contacted the police in regards to a restraining order that had been filed against him and provided Chief Brace with text messages, resulting in Chief Brace's decision to file a motion to bring back assault charges against me.

**10. Kysa states, "The police department has never found Jim to be untruthful. Chief Brace reports that Jim takes ownership over his own actions and his explanations of events make sense. Rochelle has not been credible, and they have not been able to rely on the reports that she makes. Chief Brace states that they have observed Rochelle to write false information in restraining orders and it has been difficult to verify her explanations of events."**

I, Rochelle Coburn, would like the board to know that Chief Brace is incorrect. Sergeant Aiken observed my husband being untruthful in March 2013, a few days prior to my arrest. My husband was untruthful in regards to my Kohl's credit card and Sergeant Aiken suspected that my husband was not telling the truth about a thermostat that had been removed from our wall. I have never written false statements in restraining orders and part of the reason why Chief Brace finds it difficult to verify my explanations of events is due to his refusal to go to my house and to allow my daughter and me to show him how the assaults occurred. We were denied the opportunity to show the two officers how the assaults occurred in the location they occurred. Chief Brace has never spoken to my daughter about the assault she reported.

**11. Kysa states, "Chief Brace gave the specific example of Rochelle's statement in her 3rd petition for a domestic violence order where Rochelle stated that Jim would not allow her access to the home or her property. Chief Brace reported that not long before she made that statement, Rochelle had come to the police department demanding access to the home. Chief Brace contacted Jim and Rochelle was allowed access to the house for about 45 minutes. Chief Brace served as the civil standby, and even assisted Rochelle in carrying some personal property from the home."**

**I, Rochelle Coburn, sent the following information (via email) to Kysa on October 13, 2013:**
"Up until this point, my story has not been told, and I have been falsely accused of many things. The police never took the time to listen to me and formed opinions based on Jim's lies. I know he is a very intelligent charming man when he needs to be, but I've lived with a different Jim for many years and I'm extremely afraid of him and I know what he's capable of. I have started the rest of the letter and will send you the second half when it's complete. I really need you to read both of the letters and understand that I have always been an honest woman. Jim used to tell my my best quality was my integrity and I would agree with him on that. I have no reason to lie, I have plenty of character witnesses, including members of Jim's family. The most important thing in my life is the safety of my children and their emotional well being."

I, Rochelle Coburn, would like the board to know that I sent Kysa a plethora of information in regards to my dealings with the New Boston Police Department, including but not limited to police reports, journals about the errors in the reports, journals about the abuse allegations. Please review the following information below for details:

I was assaulted by my husband in November 2012 and received an injury to my arm during the assault. I called 911 for assistance, but my husband (who has a long history of lying for personal gain) lied to the police and was not arrested for the assault. Instead, I was informed that Sergeant Aiken and the Chief of Police felt I was the primary aggressor. They informed me that if anyone were to be arrested, it would have been me.

In January 2013, my husband assaulted me two more times. When Officer Masella showed up to our home, I was too afraid to admit that Jim assaulted me. Due to the fact that the police didn't believe me when I reported the assault in November 2012 and the fact that I was unaware that my leg had a large bruise, I did not report the assault on January 3, 2013.

The following day, when I was getting undressed to take a shower, I noticed the large bruise on my leg. I drove to the New Boston Police Station to report the abuse to the Chief of Police. The Chief invited Jim to come to the station to discuss the assaults. Jim admitted he tried to grab paperwork from me, which resulted in me being violently slammed into a coffee table and ultimately causing an injury to my leg, but claimed the assault was accidental and that he didn't mean to shove me into the coffee table. He also admitted to ripping a comforter off of me later that evening, which resulted in his fist making contact with my face, but claimed that was accidental as well. I informed the Chief of Police that the actions of grabbing paperwork and ripping covers off of me were not accidental. Jim was not arrested for the assaults, as I did not wish to press charges at the time.

Page 6

It's important to point out that Jim was unaware that I did not wish to press charges when he left the police station with our daughter that evening. Rather than return home with our daughter and face the possibility of being arrested, he took our daughter to a hotel for the evening (without informing me) and did not return until the following day.

On March 9th, 2013, my daughter and I both reported that my husband assaulted us, but again, Jim was not arrested. Instead, I was arrested for simple assault against my husband. I was completely honest in reporting that I pulled my husband's hair in an attempt to stop him from assaulting my daughter.  My husband had chased after my daughter as she was running and screaming for me, pulled her to the ground, picked her back up and violently threw her on the bed, and proceeded to hold her down in a very aggressive manner. She felt like she was choking during the assault. I felt as if she were in danger as she screamed, "You're hurting me!" When I leaned in to get my daughter, Jim took his left elbow and jabbed me in the face.  He was still leaning against the bed, pinning my daughter's legs down, and holding her with his right hand when he jabbed me in the face. I got behind my husband and tried to pull him off of her, but was unsuccessful. I felt the only way to get him to let go of her was to pull his hair with both hands and yank his head back towards me. As I was pulling Jim's hair, he briefly let go of our daughter, swung around and shoved me into our dresser. I received a large bruise on my buttocks from being shoved so violently.

At that point, my daughter was no longer being held and she jumped into my arms. I ran out of the room with my daughter in my arms and dialed 911 immediately. My entire conversation was recorded from the time I dialed 911 until the time the police showed up 20 minutes later. My daughter reported that she felt like she was choking during the incident. The 911-operator sent an ambulance to our home to evaluate my daughter. When the New Boston Police showed up, approximately 20 minutes after the assault, Officer Watson called off the ambulance, without my consent, as they were pulling into my driveway. Officer Watson was a new officer in the department and admitted that she did not have the proper training to interview my daughter, but interviewed her anyway. She did not ask my daughter if she felt like she had been choked during the incident, despite the fact that the dispatcher had provided them with that information. In addition, Officer Watson did not take my daughter or me to the location where the assaults occurred to allow us the opportunity to show her what happened. My daughter, still shaken from the assault, reported that Jim assaulted both of us and that I did not assault my husband. When questioned, she repeated her account of the assaults two more time accurately.

Chief Brace admitted, under oath, that he spoke to Officer Widener on the phone and either ordered my arrest or suggested that I be arrested during that phone call. It should be noted that Officer Widener called Chief Brace before my daughter and I had finished our interviews with Officer Watson and I had not provided my written statement. When I found out I was going to be arrested, I pleaded with Officer Widener and Officer Watson to listen to the 911 call, because I was certain that my daughter's account of what happened (that her father choked her) was recorded on the call. Officer Widener and Officer Watson did not listen to the call. I continued to plead with them to listen to the call on the way to the police station and once inside during my booking process, but they would not listen to the call or call Chief Brace as I requested.

I spoke to Chief Brace after my arrest on numerous occasions. I informed him that my daughter and I did not have a chance to show Officer Watson what happened to us on March 9th, at the location it happened and my daughter had trouble explaining herself during the interview. I informed Chief Brace that I felt my daughter's voice could be heard on the 911 call, and I requested that he listen to it. Chief Brace did not even order the 911 recording until March 28th, 2013, 19 days after the assaults occurred.

When my son posted bail and I was allowed to leave the police station, I had to leave our marital residence, due to the bail conditions. I was allowed back into my home (briefly) that evening, to pack an overnight bag with some clothes and toiletries. I do not have any family members on the East Coast, so I called my friend, who was on a ski trip in Utah, and asked him if I could stay the night at his home in Goffstown. The following morning, my friend's mother offered to me stay at her home, until I could get back into my marital residence. My bail conditions did not prevent me from seeing my daughter, so she stayed with me in Goffstown during my scheduled time with her.

On April 13th, I had to cancel a civil standby that I set up because I didn't have any money to pay for it and I didn't have any money to put my personal belongings in storage. I was not receiving any child support and I was a full-time student at the time, so I wasn't working. Jim would not allow me to take any personal belongings without a police escort and I didn't have the money to pay for a four-hour standby (which was the minimum amount of time they would do).

On April 28th, I had to get another civil standby (approximately 15 minutes) to quickly retrieve a few items of clothing for myself and my daughter and some school supplies. Again, Jim would not allow me in the house without a police escort.

The bail conditions prevented from being in close proximity to Jim. Jim took advantage of that situation and started picking Danielle up from daycare on my scheduled days. Knowing that I could not contact him, Jim took Danielle to gymnastics and prevented me from having the opportunity to watch her. I was supposed to pick Danielle up from daycare everyday at 3pm and return her to Jim at 5pm (per the interim agreement), but Jim decided to pick her up each day before I could make it there from school.

Page 7

After I signed the nolle pros agreement, I was eager to get back to my regular routine with Danielle. I wanted to watch Danielle participate in gymnastics and I did not have a problem with Jim watching her as well. Unfortunately, Jim did not feel the same way. He was extremely agitated that I was allowed to pick her up again and that he could not prevent me from going to her gymnastics events.

For the record, Jim has a history of isolating his children from the other parent. He tried to isolate his son Derek from Derek's mother after his first marriage failed. In my opinion, he not only does it to punish the women who reject him, but to keep up his fake persona. Jim has a <u>long</u> history of lying about his marriages, education, wealth, etc. If the women, who know him best, happen to be near him when he's trying to impress other women, there is a possibility the many untruths he tells on a regular basis would be revealed, and that would embarrass and humiliate him. Jim has admitted his insecurities to me and has admitted that he lies to impress people because he doesn't like who he is. Unfortunately, Jim has failed to stop those behaviors, despite the fact that he has been going to counseling for over a year and is back in AA.

When I started picking up Danielle again, Jim started sending me threatening text messages and even went so far as to put up no trespassing signs on our property. I did not have a "no contact" order and that infuriated Jim. I could not understand why he was <u>acting</u> like he was afraid of me. He certainly didn't act like he was afraid of me when he sent me the following letter a few weeks prior to the nolle pros agreement.

"Rochelle,
I will be out of town on the afternoon of Wed. 4/24 and will not be able to pickup Dani from Deb's. If you would like to have her for that night, I will give you first right of refusal; otherwise I will make arrangements with a babysitter to watch her until I get home. I do not want to get you in trouble with your no contact condition, so if you could let me know at the handoff Sat 4/20 at the NBPD, I would appreciate it.
Regards,
J
Also Dani mentioned you were late to school today. If it helps, you can drop her early <u>at the house</u> and I can take her to LPD."

When Jim started sending me threatening texts and tried to intimidate me with emails from the Chief of Police, I began to realize that he would say or do anything to gain his "perceived" control over me and/or his daughter.  It became apparent that Jim would say or do anything to gain an advantage in the divorce. Jim is not afraid of me, he's just using that as an excuse to assassinate my character and make me look like an unfit mother.

I, Rochelle Coburn, offered Kysa the opportunity to listen to the 911 tape from March 9th, as well as a surveillance video that was filmed in the lobby of the New Boston Police Department in March. She did not request to listen to or view either one.

**Chief Brace reports, "On May 11, 2013, at approximately 2:04pm Ms. Coburn sent a text message to James Coburn stating, in part,,,,<u>When the charges were dropped</u> I went back to the interim agreement..."**

 I , Rochelle Coburn, would like the board to review my version of events listed below:

At the time I sent the text message, the only legal document that specified where Danielle was to be dropped off, was the Interim Agreement Pending Mediation, which was signed in November 2012. The following statement was found in section C of that agreement, "Not withstanding the foregoing, Jim shall provide the morning transportation to preschool and/or daycare all days and <u>Rochelle shall provide the afternoon transport home on all days.</u>"

When Jim found out I was going to do the exchanges at the house rather than the police station, he insisted that I violate the interim agreement and bring Danielle to the police station. I was advised by my attorney to follow what was specified in the interim agreement. When I informed Jim that I would follow the interim agreement, he started sending me harassing text messages and threatened to have me arrested for trespassing if I dropped Danielle off at home.  It's important to point out that Jim referred back to the interim agreement, after we reconciled for a three-week period in December 2012 and January 2013. We were living as husband and wife during our reconciliation and sharing our master bedroom. When we split, Jim insisted we refer back to the interim agreement, and that I move my belongings out of the master bedroom again. We spoke to Chief Brace about it on January 4th, and he agreed that we should refer back to the interim agreement as well.

It's important to point out that Jim referred back to the interim agreement, after we reconciled for a three-week period in December 2012 and January 2013. We were living as husband and wife during our reconciliation and sharing our master bedroom. When we split, Jim insisted we refer back to the interim agreement, and that I move my belongings out of the master bedroom again. We spoke to Chief Brace about it on January 4th, and he agreed that we should refer back to the interim agreement as well."



Page 8

Please refer to the following text message exchanges, emails, journals, and pictures from May 8, 2013 to June 6, 2013 for a clear understanding as to what led to my decision to file a restraining in order to protect my daughter. Hopefully the attached documents will show a clear picture of how I was treated by Jim, Chief Brace and various officers at the New Boston Police Department, after I signed the nolle pros agreement.

The following is the entire text message (nothing omitted or taken out of context) that I sent on May 11, 2013 after Jim threatened to have me arrested for trespassing.

 "Jim, I have done nothing but follow the interim agreement for the exchanges per my attorneys advice. I was picking up Dani everyday at Deb's house during the week prior to my arrest. When the charges were dropped, I went back to the interim agreement for the parenting schedule as that is what the judge ordered and what my attorney advised me to do. I want to go to her gymnastics events and I explained everything about that to the chief the other day. He told me I was following the parenting schedule and that I am allowed to be near you during those types of events and anywhere for that matter, but our conversations are to be limited to discussions about parenting issues and/or Dani's wellbeing. I do cherish my time with Dani and enjoy picking her up and spending time with her until you get off work, which is what we agreed to. I have done nothing to you and said nothing to you other than to inform you that I was going to spend my scheduled time with Dani. I have demonstrated that I am following the judges orders and my attorney's advice as far as the parenting schedule goes, nothing more. If you are unwilling to meet me at the location we agreed to per the interim agreement I will be forced to do what is in the best interest for Danielle. I hope you will reconsider and think of what our daughter would want and what the judge ordered us to do."

In June, 2013, I found out Jim was posting pictures of our daughter all over meetup.com. Meetup.com is a public site, for adults only, and anyone can access it. The people who join in meetup events are mostly strangers with common interests. I did not feel comfortable with my daughter's picture being posted on a public website without any security settings in place to protect her. There were at least 25 pictures of our daughter posted on meetup.com and Jim had just started seeing a woman who was posting our daughter's picture and name on her facebook page (without security settings) as well. I requested that Jim remove the photos of our daughter from sites that are unprotected. I told him I was okay with him posting pictures of her on his facebook page because he had security settings in place.

**Explanation about the anger management counseling:**
When Chief Brace gave my attorney a list of conditions he wanted me to sign for the nolle pros, I refused to sign anything that said I needed anger management counseling. I believe the anger management counseling, was suggested by Jim, as a way to gain an advantage in our divorce. Prior to the incident on March 9th, 2013, when I admitted to pulling my husband's hair to get him to stop assaulting my daughter, I had never initiated any physical contact with Jim. There were several incidents that led up to my fear that Jim would harm our daughter.  See Below for details:

In July 2012, Jim informed me he would leave the state with our daughter if he were ever humiliated.

In July 2012, Jim came home from a counseling appointment and took a steak I was cutting up for our family dinner and threw it in the trash.

In September 2012, Jim left our home in anger, with our daughter at 8am. We had plans to attend church together at 10am. I sent Jim several text messages (see below) requesting that he tell me where he was taking her and when he would bring her back, but he would not tell until I threatened to call the police.

In October 2012, Jim threw Danielle's toothpaste against the wall, in anger, when he was getting her ready for pre-school.

In November 2012, Jim slammed a door on my arm, in anger, because I told him he could not take our daughter on my scheduled day with her. My arm was injured in that incident.

In January 2013, Jim came after me, in anger, and tried to grab financial documents out of my arms. Jim's actions were so violent, I was slammed into our coffee table, causing a large bruise to my leg. Later that evening, Jim violently ripped a comforter off of me and hit me in the mouth with his fist during the process.

In March, when I heard my daughter screaming for me at the other end of our large home (almost 4,000 square feet), I tried to help her. When I saw her father chase her, pull her to the ground, pick her up and throw her on the bed, and proceed to hold her down very aggressively, I came to her rescue as she was screaming, "Daddy you're hurting me." My actions of pulling his hair, was not overboard, and I feel any good parent would come to the aid of their child, given the history of poor impulse control, that Jim had been demonstrating in the previous months. I was injured in the March incident as well. I was elbowed in the face, pushed, and ended up with a large bruise on my buttocks.

Page 9

Knowing that the New Boston Police Department had failed to protect my daughter and me when I reported Jim's erratic behaviors, I felt it was absolutely necessary to get to my daughter in March, when she was screaming for me, and get her out of harms way.

Other than those incidents, which occurred when I informed Jim I was leaving him, there had never been any physical altercations between the two of us, or our children, sine we met in January 2001.

Chief Brace is incorrect and misrepresenting the facts, when he states that I made a material false statement. Please read the conditions of the nolle pros agreement above for reference. There is nothing in there that states I am required to enroll in anger management counseling. Below is a list of text messages in regards to the incidents referenced above.

Please refer to the following text message exchanges, emails, journals, pictures, and police reports from September 23, 2012 to November 9th, 2012, to gain a clear understanding of what led up to the incident on November 10th, 2012, where I call 911 for assistance:

**Chief Brace omitted important details about the comment I wrote in my request for a restraining order. Please see below for the actual statement:**

"My husband also has denied us money to live on since I moved out. He was the sole provider and refuses to give me grocery money and/money for basic living expenses. **I had to call the police to get the basic necessities for me and my daughter when we moved to Goffstown.** He would not allow me into the home we both own to get a pillow, some dishes for my daughter to use at my house etc."

My statement was accurate and truthful. Please see below for a detailed explanation:

In May I found a house to rent and my mother agreed to let me borrow some money to move into it. Dani and I moved into the house on May 15th, 2014 and we had absolutely no furnishings and only a few items of clothing, toiletries, and school supplies to take with us. When I had to leave our home in early March, due to the bail conditions, it was still very cold. In mid May, I needed clothing for myself and my daughter, due to the warmer conditions.

Knowing that I was going to have Danielle with me for the weekend, I needed at least some basic necessities to make her life more comfortable at our new house. I decided the best thing to do was to get another short civil standby to get some silverware, a couple of plates, some pillows, etc. I met with Chief Brace to request a civil standby and he was extremely unhelpful. He informed me his shift was almost over and he just wanted to go home to his family. In informed him I just wanted some basic necessities for our new house and I just wanted to go home to my family as well.

When I told Chief Brace I had a right to go into my marital home and retrieve my personal belongings, he insisted I did not have that right, and threatened to arrest me if I went over there. I did not understand why I was being treated as if the house belonged "solely" to Jim and that I had absolutely no rights. The only thing I agreed to in regards to the house was that I would not seek to move back into the marital residence until and unless that move was ordered by a court or other arrangements were made suitable to the parties by our respective family attorneys.

I did not have a "no contact" order in place and I was allowed to speak to Jim about child-care and parenting issues. I should have been able to go into the house to retrieve a few items for Danielle, but Jim and Chief Brace were preventing me from doing so. I refused to back down and to allow them to treat me as a second-class citizen, so I informed Chief Brace that I would contact the state police for assistance, if he refused to help me with the civil standby. Chief Brace decided to call Jim, to see if he would agree to a civil standby. Jim agreed and I met Chief Brace at my marital home. Chief Brace told me I had approximately one hour to retrieve my belongings and I would need Jim's permission to take anything other than clothing, medicine, or toiletries.

I decided to take as many personal items as I could because there was no telling when I would be allowed back into our home to get the rest. Chief Brace spent the majority of the civil standby time outside my bedroom door with Jim. The two of them engaged in a casual friendly conversation, while I make trips back and forth from the bedroom to my car. At one point, I asked Jim if I could have a pillow and he told me to get one of Shayne's. I told him I wanted one of our pillows and he became agitated. I asked Jim for some silverware and he would not allow me to take any. He told me to take Shayne's silverware from the garage. Jim would not allow me to take any pots and only allowed me to take dishes that were mine prior to our marriage. In our marital residence, there are two couches, a futon that can be used as a couch and/or bed; two queen sized beds, and a twin bed. Jim would not allow me to take any of them for Danielle to use. He told me to take the air mattresses to sleep on.

Towards the end of the civil standby, Chief Brace helped me carry a few things to the car. Before he left, he thanked Jim for his patience. I was very cordial to Chief Brace on my way out and thanked him. He turned to look at me, did not say a word, and then walked away to his car.

Page 10

<u>After</u> Chief Brace left, Jim started to pack a few items up for me and left them in the garage to pick up. He continued to deny me access to our home without a police escort. I continued to request items to make Danielle's life more comfortable at her new house. I did not receive any furniture from Jim and when he gave me certain items, he controlled the entire thing and gave me the toys/clothing that was either old, too small, or torn. He would not give me any of her books, even though I was the only one who read to her each night. He wouldn't even allow Dani to take a few of her own books to our new house and she started crying.

**As you can see, I clearly stated that I was not allowed into our home, <u>without a police escort</u>, to get my personal belongings. I find it very interesting that Chief Brace omitted certain parts of my statement; to make it appears as though I made several material false statements, when in fact, I had not.**

Explanation of the incident in November and how it was handled by the New Boston Police.
November 11th, 2012
The following is a description of what occurred on November 10th, 2012:

My husband Jim Coburn left for an AA meeting around 6am. My daughter Danielle woke up shortly after he left and I got her dressed and made her breakfast. She was downstairs eating her breakfast and watching cartoons when Jim came home. I was upstairs cleaning and organizing her closet, so I could move her clothes from the master bedroom closet to her own closet. Jim came home from his AA meeting and approached me in the upstairs hall. He told me he was going to take Danielle for the day because I had her during the day the previous Saturday. I told him that was not the agreement we had and that I already had plans with her. I reminded him that we have been splitting time with her every Saturday and Sunday and that Saturday nights are my personal nights therefore, I would be spending quality time with her during the day.

The conversation between my husband and I moved from the hallway into Danielle's bedroom and Jim appeared to be very agitated. He told me he had plans too and that he was going to take our daughter. I told him he couldn't just change the routine at the last minute without discussion and that I would call the police if he took her away from me during my time with her. He said, "Go for it" and slammed our daughter's door in my face. I used my right hand to turn the handle because I thought he was going to lock the door. Jim had been locking me out of our master bathroom to agitate me in the prior weeks, and I thought he was doing it again. I needed use that door to get to our daughter's clothes. As I turned the handle, I was telling Jim to leave the door unlocked. At that moment, the door opened rather quickly as I did not expect it to be unlocked.

I noticed Jim walking away in the master bathroom and his back was turned to me. Jim turned around when he noticed I was entering the master bathroom and grabbed the door with his left hand. Jim is left-handed. Jim had a horribly angry look on his face, walked towards me, opened the door back up, and slammed it forcibly. I tried to get out of the way, when he slammed the door, but didn't make it all the way out and my left arm got slammed in the door. As I was pulling my left arm back towards me, I received red marks and scratch marks on the top of my left arm, wrist, and hand, as the door slammed and it got lodged between the door and the doorframe.

After realizing my arm had been slammed in the door, <u>and after I got it completely out of the way, Jim shut the door and locked it.</u> I yelled at Jim from the other side of the door that he had just slammed my arm in the door and that I was going to call the police. I became very fearful that Jim was going to take our daughter as he had threatened to do in July 2012. In addition, Jim had taken our daughter in September, when he was angry with me, and I was afraid he was going to do it again.

I ran down stairs as I was calling the police on my cell phone and I was trying to get to my daughter to protect her. I did not feel my husband was in control and I was afraid for her safety as well as mine. <u>I got to our daughter and was holding onto her, when Jim grabbed hold of our daughter and was pulling her out of my arms. I was struggling to keep my arms around our daughter, but Jim overpowered me and yanked her away. As I was on the phone with the dispatcher, I kept asking Jim to put her down, but he refused to do so. He was pacing in the kitchen with our daughter in his arms until police arrived. It was a very frightening situation and given the fact that he had been diagnosed with chronic depression in July and had informed me he was going to go off his medication, I was afraid he might harm me, my daughter, and/or himself.</u> His irrational behaviors had been escalating since June when I told him I was going to file for divorce.

March 25, 2013
After I was arrested in March, I went to the NBPD, to discuss my bail conditions and to find out how I was going to do the exchanges for my daughter with Jim. When I was in the lobby, I discussed several things with Sergeant Aiken. The conversation went well at first (the Chief agreed after reviewing the video), but went downhill after I asked Sergeant Aiken to update his report from November with the new information I had provided. I have a copy of the video, which appears to be edited. I had the video analyzed and I will include a copy of the report. (Attachment J)

**12. Kysa states, "On January 10, 2014, Rochelle went to the New Boston Police Department to procur Dani's snow pants. Upon receipt of Rochelle's email, the GAL called Rochelle to discuss what was gong on. When the GAL attempted to**

Page 11

discuss whether it was appropriate to go to the police about snow pants, Rochelle began to raise her voice, claimed that the GAL was harassing her and then hung up."

**The incidents that Kysa referred to occurred on December 9th, and 10th, 2013, not January 10th, 2014.**

I, Rochelle Coburn, sent the following information (via email) to Kysa on December 9, 2013:
I sent this text to Jim before he dropped her off to me today.
<u>"Text to Jim: 4:40pm Dec. 9</u>
Please bring Dani's ski pants and make sure she has appropriate winter clothing for school tomorrow and Wednesday. The clothing is hers and she should be dressed appropriately for winter. Do not send her in crocs when you bring her. The court order will clarify if you have any confusion."

I, Rochelle Coburn, sent the following information (via email) to Kysa on December 9, 2013 at <u>8:15pm:</u>
He has been sending her to me in her crocs and it is too cold for her to wear those. <u>He has her winter boots and ski pants that she needs for school.</u> She can't go outside for recess if she doesn't have the appropriate clothing. Jim has been sending Dani to me in clothes that are either too small or things that have holes. I had Janina put a statement in the court order to prevent it from happening. I have tried to be reasonable with Jim. I have offered to go to counseling with him to get on better terms and coparent collaboratively. He has declined and continues to do things to aggravate me. Unfortunately his spiteful ways affect Danielle. I was just letting him know that I'm aware that he sent her in clothing and boots that don't fit her, when he could have given her the newer boots and ski pants that do fit her. I don't know how to get him to stop those types of things, but I sure would appreciate it if he would. "

<u>Text to Jim: 6:34pm Dec. 9</u>
You sent Danielle to me in size 11 boots. She wears a size 1. She has ugg boots that you bought her for this year. You should have sent her in those. In addition you sent her black bib ski pants from two years ago and those are size 4. Danielle wears a size six almost size 7. In addition <u>you bought her a plaid pair of ski pants that fit her</u> and you failed to provide appropriate clothing for her for tomorrow and Wednesday. Her boots are so small her toes were crammed in them. Her bib ski pants are too small as well and will not provide adequate protection. I will not allow you to play these games with her clothing. I'm forwarding a copy of this to my attorney and the guardian.

I, Rochelle Coburn, received the following message (via email) from Kysa on <u>December 10, 2013 at 12:53pm:</u>
"I've received this information and a lot of other texts/journals/emails etc. from you with communication to Jim. Do you think that the texts below and your other communication to Jim is helpful or constructive? I'd like to hear your thoughts on this, and how your communication helps Dani and coparenting with Jim."

I, Rochelle Coburn, sent the following information (via mobile phone) to Kysa on <u>December 10, 2013 at 4:43pm:</u>
I asked Jim to give me Dani's snow pants last night and he gave me a pair that don't fit her. I asked him to take her other pair to school today so she could have them for recess. He replied by telling me those don't fit either, but I know they do and Dani has informed me that they fit her. Jim did not comply with my request and told me it was time for me to step up to the plate. I informed him that I'm not receiving any child support and I already bought her a new pair of snow boots, a hat, and mittens. I am now sitting I'm the lobby of the New Boston Police Department waiting for Sergeant Aiken to call Jim and provide the snow pants. The court order states, "Each parent shall supply the appropriate child's clothing for their scheduled time with the other parent. It snowed today. I will let you know if he complies with Sergeant Aiken's request.

I, Rochelle Coburn, received the following message (via email) from Kysa on <u>December 10, 2013 at 4:45pm:</u>
"It is not the police department's job to enforce provisions about snow pants. Where is Dani right now? This is really unhelpful and I suggest that you find an alternative method to resolve this issue."

<u>I, Rochelle Coburn, received a phone call from Kysa on December 10, 2013 at 5:11pm</u> that lasted approximately 5 minutes.
I had not seen Kysa's email to me before she called. Kysa was extremely rude and spoke down to me in a condescending manner. At one point during the conversation she said, "What is he supposed to do, pack a suitcase each time he sends her to you?" I informed Kysa that I did not like her tone and I would prefer that she speak to my attorney rather than call me at home to voice her "opinions" as to why I got the police involved. Kysa continued to speak down to me, so <u>I ended the call by informing her that I already asked her to speak to my attorney and that she needed to stop harassing me.</u>

*I contacted my attorney as soon as I got off the phone with Kysa on <u>December 10, 2013pm at 5:17pm</u> and left a message
I informed my attorney about my conversation with Kysa and that I felt she was extremely biased and unprofessional based on her conduct during our scheduled meeting, her emails, and the phone call. In addition, I informed my attorney that I felt she had not investigated our case in a timely fashion and that was detrimental to my daughter's wellbeing. I informed my attorney that I wanted to take immediate steps to get a new guardian for my daughter.

Page 12

I, Rochelle Coburn, sent the following response (via email) to Kysa on <u>December 10, 2013 at 5:46pm:</u>
I respectfully disagree. My son watched Danielle when I went to the police department. Perhaps you should ask Jim why he continually does things that are inappropriate when it comes to my daughter's well being. I sent him numerous texts requesting that he provide her snow pants for school. Please see texts below. <u>My attorney will be in contact with you soon.</u>

December 9, 2013 4:40pm
Text from Rochelle to Jim:
Please bring Dani's ski pants and make sure she has appropriate winter clothing for school tomorrow and Wednesday. The clothing is hers and she should be dressed appropriately for winter. Do not send her in crocs when you bring her. The court order will clarify if you have any confusion.

December 9, 2013pm 6:34pm
Text Rochelle to Jim:
You sent Danielle to me in size 11 boots. She wears a size 1. She has ugg boots that you bought her for this year. You should have sent her in those. In addition you sent her black bib ski pants from two years ago and those are size 4. Danielle wears a size six almost size 7. In addition you bought her a plaid pair of ski pants that fit her and you failed to provide appropriate clothing for her for tomorrow and Wednesday. Her boots are so small her toes were crammed in them. Her bib ski pants are too small as well and will not provide adequate protection. I will not allow you to play these games with her clothing. I'm forwarding a copy of this to my attorney and the guardian.
December 10, 2013 7:09AM
Text Rochelle to Jim
Please drop off Dani's plaid ski pants at school this morning, so she can play outside at recess. The ski bib you gave me does not fit and definitely won't fit over her clothing. It's a size four and I had her try it on again this morning.

December 10, 2013
Text Jim to Rochelle
The other ones are too small as well, maybe it is time for you to step up to the plate.

December 10, 2013
Text Rochelle to Jim
I am not receiving any child support for her. Bring the plaid pants to school please. I already had to buy her snow boots. The plaid pants will fit.

December 10, 2013 AM
Text Rochelle to Jim
I bought her a hat and mittens as well.

December 10, 2013 4:33
Text Rochelle to Jim
I need Danielle's plaid ski pants. Please let me know where we can meet so you can give them to me.

No reply from Jim.
It is now 5:45pm and I still have not heard from Jim.

I, Rochelle Coburn, received the following message (via email) from Kysa on <u>December 10, 2013 at 6:18pm:</u>
"I also wanted to ask - did it occur to you that Jim was not available to immediately drive the other pair of pants to school? Sometimes parents forget things, and it isn't a huge deal that couldn't be remedied the next day instead of instantaneously."

I, Rochelle Coburn, sent the following response (via email) to Kysa on <u>December 10, 2013 at 7:02pm:</u>
Kysa,
<u>My attorney will be in contact with you tomorrow.</u>
Rochelle

Received the following message from Kysa (via email) on <u>December 10, 2013 at 7:03pm:</u>
"I have all ready called and emailed her. This is a circumstance though that can better be explained by you."

**13. Kysa states, "When Rochelle replied that she was not confused and understood that the GAL had recommended JoAnn Cobb for her, the GAL then questioned <u>why Rochelle would tell Jim that I had recommended JoAnn Cobb for Dani.</u>"**

I, Rochelle Coburn, received the following information (via email) from Kysa on January 10th, 2014:
"I am trying to understand this situation. So you understood that I was not making a recommendation that Dani go to counseling

Page 13

and see JoAnn Cobb? If that is so, why did you tell Jim that I had recommended JoAnn with the <u>insinuation</u> that I had recommended her for Dani? Jim provided the screen shots of the text messages and it seemed clear to me. You also mentioned in the text that you do not need Jim's agreement to take Dani to counseling, or regarding who the provider would be. Can you point out the portion of the court order that allows for that? I am unclear where that provision is."

I, Rochelle Coburn, sent Kysa (via email) the following information on January 10th, 2014:
"I will respond to this when I get home. Have you recommended counseling for Jim? If so, why haven't I been notified. I find it interesting that you suggest I enroll in counseling and that information is given to Jim so he can use it to antagonize me. I find that unethical and unprofessional."

I, Rochelle Coburn, received the following information from Kysa(via email) on January 10th, 2014:
"To respond to the issues raised here, recommendations that I make are not confidential. They will be shared with either party, most especially when I issue my opinion letter or report. <u>I have not recommended counseling for Jim at this point, because I am not seeing the same issues with Jim that I am seeing with you.</u> I am concerned about the very frequent nature of your communication with Jim, constant editorializing and threats towards Jim in your communication, and at times what seems to be difficulty curbing your emotions and the effect that has on you. <u>I do not think that talking with your priest is an effective way to better your parenting and communication skills, and I think that you need a strong counselor</u> who can help you examine what is and is not working for you and help you improve these issues.

I would certainly be happy to discuss ideas for how you can get into therapy quickly."

I, Rochelle Coburn, sent the following message (via email) to Kysa on January 13, 2014:
I am an excellent mother who has been dealing with a pathological lying controlling man for 12 years. I don't speak to Jim at all. All communication is via text or email. It's interesting that you feel I have a difficult time curbing my emotions and that you somehow know what kind of an effect it's had on me. What emotions are you referring to and how would you know if it's affected me? Have you ever asked me or are you getting this so called information from Jim? If so, you should probably consider the source and or consult with some of the people in my life for character witnesses. I am assertive, I am a great mother, and and I am a hard working employee. You need to step down.

**14. Kysa states, "Rochelle's position on the outcome of this case is that "Dani should live with (her) 100% of the time until Jim can get help and get on board with cooperative parenting which involves doing what is best for Dani, not himself."**

I, Rochelle Coburn, would like to the board to know that Kysa omitted important information regarding my position on custody. When Kysa posed the custody question, I told her I wanted my husband to have a healthy relationship with Danielle, but I had serious concerns about my daughter's physical and emotional wellbeing, while in his care. I informed Kysa that my husband had been emotionally abusive for years, admitted the abuse in a letter to me, and began to be physically abusive after I filed for a divorce. I told Kysa I wanted my husband to get help with his mental health issues and to get on board with collaborative parenting, which involved doing what was best for our daughter. (Attachment)

**15. Kysa states, "Each parent bought Dani a costume, and each parent <u>insisted</u> that Dani wear the costume they purchased during <u>their</u> time on Halloween."**

I, Rochelle Coburn, would like it to be known that I was supposed to have Danielle at 5pm on Halloween and she was supposed to spend the rest of the evening with me. It was agreed on in court. Jim violated the agreement and would not allow Danielle to spend her scheduled time with me. This is an issue (along with many others) of contempt and my attorney has filed the appropriate documents. We are currently waiting for a hearing date. I sent the following information (via email) to Kysa on October 31, 2013:
"I purchased a costume for Danielle on October 5th and notified Jim. He went out and purchased a 2nd costume for her, which is what she will be wearing when I pick her up. I will need to get her changed back into her original costume as that is the one she prefers to wear on Halloween night." <u>I did give her a choice and she informed me she wants to wear the one she picked out with me. (Attachment K)</u>

Page 14

I, Rochelle Coburn, would like the board to know that the following statements are not factual and I will provide a detailed explanation on each one, if requested to do so by the board.

Kysa states, "For reasons outlined in this report, most especially with the drastic degree to which Rochelle lashed out at the GAL over questions about the snow pants/police incident and Dani's enrollment in counseling, the GAL believes that it would be important for the parties to obtain a family psychological assessment to determine:"

Kysa states, "The GAL believes that Dani should be enrolled in counseling right away. It seems both parents have wanted Dani in counseling since at least September 2013, but for reasons not quite understood by the GAL, that has not happened."

Kysa states, "However, the GAL is concerned about the hostility and animosity with which Rochelle lashes out to anyone who even slightly disagrees with her and the degree to which Dani may be exposed Rochelle's rage."

Kysa states, "With the results of the evaluation, the GAL hopes that changes can be made to address the situation and improve things for Dani without a change in shared residential responsibility. Otherwise, if behavior is not modified, it is clear that a shared residential schedule would not be in Dani's best interests."

Kysa's recommendation that, 'Rochelle re-enroll in counseling with Dr. Luchanok. Rochelle shall sign authorizations to allow the GAL to speak with Dr. Luchanok."

Kysa states, "Until recently, Jim suggested a shared parenting schedule. However, in December 2013, Jim filed a motion for primary residential responsibility. He argues that Rochelle has routinely put Dani in the middle, been openly hostile in front of Dani towards Jim and other third parties, made unilateral decisions and acted contrary to Dani's best interests."

Kysa states, "During the treatment, Rochelle kept an online journal and on June 21, 2009, wrote the following:

Jim-thank you for being such a wonderful father to our children. Sharing the same DNA does not make someone a father-it's the tender loving care that counts and I thank you for proving that to Shayne and for being such a positive role model in his life. You've been there for him since the day I met you and you deserve all the credit-I love you."

Kysa states, "Rochelle holds a Bachelor of Arts from California State University Channel Islands and has 9 credits worth of graduate courses at New England College. Rochelle also earned her teaching credentials in 2013 from the Upper Valley Educator's Institute in Lebanon, NH. Rochelle works at the Chichester Central School as a long term substitute teacher, and formerly worked in the Goffstown School District as a special education teacher between 2006 and 2010."

Kysa states, "The GAL was unaware that Rochelle intended to bring Shayne to the meeting, and asked Shayne to wait outside and to meet with the GAL afterwards."

Kysa states, "that Jim does not pay child support and that Jim would not give her a space heater and left her to freeze when her furnace went out while Jim allowed his girlfriend to sleep in the marital home."

Kysa states, "She argues that Jim is a sociopath and is abusive to her and Dani. Rochelle listed reasons for her diagnosing Jim as a sociopath: 1) reckless spending: 2) no empathy; 3) anti-social behavior; 4) isolating Rochelle from her family by moving to NH."

Kysa states, "Rochelle currently has criminal charges pending in the Goffstown District Division."

Kysa states, "Rochelle said she is an intelligent woman, multiple times, and had wanted to be a psychiatrist but it was to much schooling for her."

Kysa states, "Jim completed high school and attended some college at El Camino College."

Kysa states, "Jim opened a consulting business named Global Trade Advisors and he currently has two active clients."

Kysa states, "At the Halloween party, he says that Rochelle was making faces and rolling her eyes at him, and even Dani mentioned noticing it."

Kysa states, "Her favorite movie is Puss N' Boots and she likes the television show Doc McStuffins. She is petty sure [her] BFF is Riley."

Kysa states, "Chief Brace has observed that when Rochelle does not get her way, she becomes very difficult to deal with."

Page 15

Kysa states, "Among other domestic disturbances, the police were called to the Coburn home in March 2013. Chief Brace explained that each party had their own living space and also that there were common areas. Jim, during his parenting time with Dani, was on his side of the home an trying to give Dani some medicine. Rochelle interjected herself into the situation. Rochelle claimed Jim was choking Dani, but the police had difficulty believing her account because she had also alleged that at the same time Jim was supposedly choking Dani he was blocking Rochelle and tackling her. The police interviewed Dani and could not verity Rochelle's version of events."

Kysa states, "After the meeting with Rochelle ended, Shayne came in with a standoffish demeanor."

Kysa states, "Shayne states that Jim exposed him to stories about Jim's drug use during college when Shayne was as young as 13."

Kysa states, "Because of the very small waiting space and the ease with which one can hear through the GAL's office door, the GAL asked Rochelle to wait in her vehicle while the GAL and Shayne spoke."

Kysa states, "Shayne recalled an incident involving a Taco Bell burrito. He said that he could not eat a lot of food after chemotherapy, and he bought himself a $.89 burrito. He says that Jim got very upset that he bought the burrito. The GAL did not understand the nature of the dispute about the burrito from Shayne's account."

Kysa states, "Mrs. Marchessault has observed Jim to come to every school event. She knows that Rochelle works and is not as available to attend the school events."

Kysa states, "Rochelle has mentioned that Dani may move to a new school district during the academic year. Mrs. Marchessault felt that could be a rough transition for Dani."

Kysa states, "Her favorite thing to do at her mother's house is sledding or skiing and she likes when her friends come over to her dad's house."

Kysa states, "When she is with her friends, it makes her happy to play games and upset when Riley does not listen to her."

Kysa states, "Rochelle has filed three domestic violence petitions against Jim. The first two were withdrawn and dismissed after a contested hearing. The third (#638-2013-DV-0039) petition was dismissed, and the order reads, in part:

Kysa states,"In Jim's GAL questionnaire from September 2013, he stated that he would like Dani to see a counselor to help her cope with the divorce. He has observed changes in her behavior such as bedwetting, waking in the middle of the night, anxiety about being alone upstairs, clingy, and secretive." He is still on board, but has these concerns:

My only concern when Dani told me last night that Mama was going to take her to counseling was that it was a counselor we both agreed upon. Rochelle indicated that it was someone you recommended, which is helpful, but I told her I still want to be involved in, including the interview and selection process. She seems to think otherwise (I know your take on these, but screenshots attached). For me, the desired outcome should be a safe place for Dani where she can work through her concerns and fears. To me that requires both parents being involved while we play a neutral role, with no hidden agendas or coaching."

Kysa states, "Ms. Talon recalled another incident where Jim and Rochelle came out to California in June 2012 for a wedding and elementary school reunion."

Kysa states, "Ms. Talon recalls a phone call from Jim after Jim and Rochelle got into a fight about money. The fight was during Shayne's cancer treatment and Jim became upset when Rochelle purchased something at Dunkin Donuts. Jim discussed finances with Ms. Talon, and she states that he could not grasp the concept that Ms. Talon and her husband shared all of their finances and she observed that Jim wanted to control all the money and not allow Rochelle access."

Kysa states, "Jim has many concerns about Rochelle. He is concerned about the level of hostility, and says that he does not want to be in close proximity to Rochelle. Rochelle has said "nasty" things to him in front of Dani. He avoids contact with her, such as at the soccer games, because it is not healthy. Even then, Rochelle has come after him and yelled at the soccer field complaining that he has kept his distance."

Sincerely,


Rochelle Coburn


Page 16

**From:** Rochelle Coburn [mailto:rcoburn@uvei.org]
**Sent:** Friday, January 31, 2014 12:53 PM

Friday, January 31, 2014 AOL: Legalpug

Page 2 of 2

**To:** Guardian Ad Litem Board
**Subject:** Kysa Crusco

I would like to know if Kysa Crusco's license has expired. I would also like to know who to contact to file a formal complaint.

Thank you,

Rochelle Coburn

From: **Guardian Ad Litem Board** <Guardian.Litem@nh.gov>
Date: Friday, January 31, 2014
Subject: Kysa Crusco
To: Rochelle Coburn <rcoburn@uvei.org>

Rochelle,

GAL Crusco's certification expired on 1/21/14. She has until 4/21/14 to submit a complete application for re-certification.  Since her application was not complete prior to her expiration date she is considered expired until the Board votes on a completed application.

The complaint process and necessary forms can be found at:  http://www.nh.gov/gal/complaints.htm

Please let me know if you have any further questions.

Jennifer
GAL Board Secretary

**Statement of Confidentiality:**  Some of the contents of this message, including any attachments, may be confidential.  Any unauthorized disclosure, reproduction, use or dissemination (either whole or in part) is prohibited.  If you are not the intended recipient of this message, please notify the sender immediately and delete the message from your system.

**From:** Rochelle Coburn [mailto:rcoburn@uvei.org]
**Sent:** Friday, January 31, 2014 1:08 PM
**To:** Guardian Ad Litem Board
**Subject:** Crusco

Thank you for getting back to me. Is she allowed to continue working on a case if her license is expired? Has she submitted an application yet and if so, when does the board vote?

From: **Guardian Ad Litem Board** <Guardian.Litem@nh.gov>
Date: Fri, Jan 31, 2014 at 1:11 PM
Subject: RE: Crusco
To: Rochelle Coburn <rcoburn@uvei.org>

Rochelle,

Currently there is no GAL rule that prevents her from staying on a case. It is up to the Judge. The Board is in the process of re-writing its rules and I believe intends to put something in about an expired certification. She has submitted an application but it is not complete yet. I anticipate it will be complete and the Board will be able to vote at their next meeting on February 21, 2014.

Jennifer

**Statement of Confidentiality:** Some of the contents of this message, including any attachments, may be confidential. Any unauthorized disclosure, reproduction, use or dissemination (either whole or in part) is prohibited. If you are not the intended recipient of this message, please notify the sender immediately and delete the message from your system.

**From:** Rochelle Coburn [mailto:rcoburn@uvei.org]
**Sent:** Friday, January 31, 2014 2:59 PM
**To:** Guardian Ad Litem Board
**Subject:** Crusco

Hello,

Sorry to bother you again, but can you tell me Kysa has completed any training sessions? If so, can you tell which ones and provide the dates they were completed?

From: **Guardian Ad Litem Board** <Guardian.Litem@nh.gov>
Date: Fri, Jan 31, 2014 at 3:01 PM
Subject: RE: Crusco
To: Rochelle Coburn <rcoburn@uvei.org>


Here are the dates she took the GAL Board trainings:

General      10/21/05
District      4/20/07
Probate      4/28/07
Superior     4/14/07

Fwd: Crusco  ⅀  1 Court/1 By Year/2016/4 April 2016 ✕

**Rochelle Coburn** <rcoburn@uvei.org>
to me

Apr 8, 2016, 10:47 AM

---------- Forwarded message ----------
From: **Rochelle Coburn** <rcoburn@uvei.org>
Date: Wed, Feb 19, 2014 at 12:20 PM
Subject: Re: Crusco
To: Guardian Ad Litem Board <Guardian.Litem@nh.gov>


Thank you. Now can you tell me how many complaints have been filed against Kysa or where I can obtain that info.

Fwd: Crusco  Σ   1 Court/1 By Year/2016/4 April 2016 ×

**Rochelle Coburn** <rcoburn@uvei.org>
to me

Fri, Apr 8, 2016, 10:47 AM

---------- Forwarded message ----------
From: **Guardian Ad Litem Board** <Guardian.Litem@nh.gov>
Date: Wed, Feb 19, 2014 at 12:23 PM
Subject: RE: Crusco
To: Rochelle Coburn <rcoburn@uvei.org>

I can tell you there have been no founded complaints against Kysa Crusco. I cannot confirm nor deny if there have been any unfounded complaints.

**Statement of Confidentiality:**  Some of the contents of this message, including any attachments, may be confidential.  Any unauthorized disclosure, reproduction, use or dissemination (either whole or in part) is prohibited.  If you are not the intended recipient of this message, please notify the sender immediately and delete the message from your system.

From: **Guardian Ad Litem Board** <Guardian.Litem@nh.gov>
Date: Wed, Feb 19, 2014 at 2:40 PM
Subject: RE: Crusco
To: Rochelle Coburn <rcoburn@uvei.org>

Rochelle,

Here is the process for filing a complaint.
1. Either the $100 fee is paid or the request to waive the complaint fee form is filed.
    a. If you are filing a waiver the Board must vote on that first before they review the complaint.
2. After either the fee is paid or the waiver is approved and a complete complaint is filed with all copies the complaint sub-committee reviews it. They have a meeting in non-public session to discuss their recommendations to the full Board.
3. The full Board is briefed on the complaint and votes to either dismiss it, send to the GAL for a response or ask for more information from you
    a. . If complaint is dismissed you have the right to an oral argument.

        i. The Board will then vote after the oral argument whether or not to sustain the original dismissal or overturn the dismissal.
    b. If more information is requested you have 45 days to provide it.
    c. If it goes to the GAL for a response the GAL has 30 days from date of letter to file a response.

        i. The Board reviews the response and decides whether or not to either: dismiss the case, ask for more information or proceed with an investigation.
4. If the Board decides to proceed with an investigation after the facts are gathered a Public Disciplinary Hearing will be held.
    a. It is at this hearing after the case is presented,(the investigator & GAL), the Board discusses and votes on the violations and issues sanctions if any.

From start to finish the quickest a license could be revoked is probably June, unless the allegations are egregious enough for emergency intervention.

If you are planning on filing a waiver, I suggest you get it to me by Friday morning at 9:00am for the Board to vote on then in March they can review your complaint.

Jennifer

**Statement of Confidentiality:**  Some of the contents of this message, including any attachments, may be confidential.  Any unauthorized disclosure, reproduction, use or dissemination (either whole or in part) is prohibited.  If you are not the intended recipient of this message, please notify the sender immediately and delete the message from your system.

From: **Rochelle Coburn** <rcoburn@uvei.org>
Date: Wed, Feb 19, 2014 at 2:17 PM
Subject: Re: Crusco
To: Guardian Ad Litem Board <Guardian.Litem@nh.gov>

If Kysa gets her licensed renewed and I file my complaint after, do I need to wait for another board meeting to find out I the will revoke it? If so, when is next board meeting?

**From:** Rochelle Coburn <rcoburn@uvei.org>

**Subject: Re: Crusco**

**Date:** February 19, 2014 11:40:51 AM EST

**To:** Rochelle Coburn <rockyp88@comcast.net>

Hello, can you let me know if Kysa Crusco completed her application for the board meeting tomorrow? Is the meeting public and if so, what time is it scheduled?

Forwarded message
From: **Guardian Ad Litem Board** <Guardian.Litem@nh.gov>
Date: Wed, Feb 19, 2014 at 11:49 AM
Subject: RE: Crusco
To: Rochelle Coburn <rcoburn@uvei.org>

Rochelle,

Yes her application is complete.  Applications are discussed in non-public session.  There is a public comment session at the beginning of the meeting if you would like to speak.  I have attached the public comment guidelines.  The meeting starts at 1:00pm in Room 101 of the Legislative Office Building 33 North State St.

Jennifer

**Statement of Confidentiality:**  Some of the contents of this message, including any attachments, may be confidential.  Any unauthorized disclosure, reproduction, use or dissemination (either whole or in part) is prohibited.  If you are not the intended recipient of this message, please notify the sender immediately and delete the message from your system.



## State of New Hampshire
## Guardian ad Litem Board

25 Capitol Street - Room 120, Concord, New Hampshire 03301
TDD Access: Relay NH 1-800-735-2964
Web site: www.nh.gov/gal

Phone: (603) 271-1199
Fax: (603) 271-6600
E-mail: gal.board@nh.gov

**Receipt**   Received from

Rochelle Coburn

$100 in cash

2/20/14

Chris Keating

From: **Rochelle Coburn** <rcoburn@uvei.org>
Date: Thu, Feb 20, 2014 at 9:03 AM
Subject: Complaint
To: Guardian Ad Litem Board <Guardian.Litem@nh.gov>

Please be advised that I am in the process of copying documents to file a formal complaint against Kysa Crusco today. I will be in shortly and request that the board address my complaint before making a determination to decertify.

Thank you,
Rochelle Coburn

---------- Forwarded message ----------
From: **Rochelle Coburn** <rcoburn@uvei.org>
Date: Thu, Feb 20, 2014 at 11:59 AM
Subject: Re: Crusco
To: Guardian Ad Litem Board <Guardian.Litem@nh.gov>


Hi Jen,
I turned my formal complaint in today and paid the fee. Please let me know the outcome of the boards decision if you can. Thank you for your speedy replies to all my questions.

Rochelle Coburn

Forwarded message

From: **Guardian Ad Litem Board** <Guardian.Litem@nh.gov>
Date: Thu, Feb 20, 2014 at 3:26 PM
Subject: RE: Crusco
To: Rochelle Coburn <rcoburn@uvei.org>

I am not in the office today.  I will email you tomorrow to confirm I received a complete complaint.  I cannot guarantee that the Board will review your complaint before reviewing Kysa's application.

**From:** Rochelle Coburn [mailto:rcoburn@uvei.org]
**Sent:** Friday, February 21, 2014 3:39 AM
**To:** Guardian Ad Litem Board
**Subject:** Kysa's Report

Hi Jen,

I'm sending you a copy of Kysa's preliminary report to include with my evidence for the board. I would have printed it out, but it would have been an additional 50+ pages, so it's probably easier to just let them review the pdf file.

I really hope the board will review my complaint prior to making a decision, as it involves the safety of my child, who made an abuse allegation to multiple agencies, and I believe Kysa failed to properly investigate the allegations.

Thank you,
Rochelle Coburn

From: **Rochelle Coburn** <rcoburn@uvei.org>
Date: Fri, Feb 21, 2014 at 4:40 PM
Subject: Board meeting
To: Guardian Ad Litem Board <Guardian.Litem@nh.gov>

How can I get results of the board meeting and whether or not they addressed my complaint?

Forwarded message
From: **Guardian Ad Litem Board** <Guardian.Litem@nh.gov>
Date: Fri, Feb 21, 2014 at 9:03 AM
Subject: RE: Kysa's Report
To: Rochelle Coburn <rcoburn@uvei.org>


Rochelle,

I have received your complaint and fee.  It appears to be complete at this time.  I will let the Board know of the PDF file you have sent.

Jennifer

From: **Rochelle Coburn** <rcoburn@uvei.org>
Date: Fri, Feb 21, 2014 at 12:03 PM
Subject: Re: Kysa's Report
To: Guardian Ad Litem Board <Guardian.Litem@nh.gov>


Hello again, did the sub committee send my complaint through today?

On Friday, February 21, 2014, Rochelle Coburn <rcoburn@uvei.org> wrote:
  Thank you very much

On Monday, February 24, 2014, Guardian Ad Litem Board <Guardian.Litem@nh.gov> wrote:

Hi Rochelle,

The Board did not have time to review Kysa Crusco's application or your complaint.  They should be dealt with at the March meeting.

Jennifer

**Statement of Confidentiality:**  Some of the contents of this message, including any attachments, may be confidential.  Any unauthorized disclosure, reproduction, use or dissemination (either whole or in part) is prohibited.  If you are not the intended recipient of this message, please notify the sender immediately and delete the message from your system.

**From:** Rochelle Coburn [mailto:rcoburn@uvei.org]
**Sent:** Monday, February 24, 2014 9:45 AM
**To:** Guardian Ad Litem Board
**Subject:** Update

Hi Jennifer,

I really need to know if my complaint about Kysa was reviewed by the board on Friday or if it is going to be reviewed at a future meeting.

Thank you

Rochelle

From: **Rochelle Coburn** <rcoburn@uvei.org>
Date: Mon, Feb 24, 2014 at 11:22 AM
Subject: Re: Update
To: Guardian Ad Litem Board <Guardian.Litem@nh.gov>

Ok when is the hearing in March?

Forwarded message

From: **Guardian Ad Litem Board** <Guardian.Litem@nh.gov>
Date: Mon, Feb 24, 2014 at 11:23 AM
Subject: RE: Update
To: Rochelle Coburn <rcoburn@uvei.org>

March 21st the application and complaint however are reviewed in non-public session.

**Statement of Confidentiality:**  Some of the contents of this message, including any attachments, may be confidential.  Any unauthorized disclosure, reproduction, use or dissemination (either whole or in part) is prohibited.  If you are not the intended recipient of this message, please notify the sender immediately and delete the message from your system.

From: **Rochelle Coburn** <rcoburn@uvei.org>
Date: Wed, Feb 26, 2014 at 10:10 AM
Subject: Complaint
To: Guardian Ad Litem Board <Guardian.Litem@nh.gov>


Hi Jen,
Since my board hasn't seen my documents yet, can I provide additional evidence to support my complaint?

Thank you,
Rochelle

Forwarded message
From: **Guardian Ad Litem Board** <Guardian.Litem@nh.gov>
Date: Wed, Feb 26, 2014 at 11:16 AM
Subject: RE: Complaint
To: Rochelle Coburn <rcoburn@uvei.org>

Yes you can. Please be sure to provide 4 copies total.

**Statement of Confidentiality:** Some of the contents of this message, including any attachments, may be confidential. Any unauthorized disclosure, reproduction, use or dissemination (either whole or in part) is prohibited. If you are not the intended recipient of this message, please notify the sender immediately and delete the message from your system.

From: **Rochelle Coburn** <rcoburn@uvei.org>
Date: Fri, Feb 28, 2014 at 9:02 AM
Subject: Kysa Crusco
To: Guardian Ad Litem Board <Guardian.Litem@nh.gov>


Hi Jen,

I have an urgent situation I am dealing with and I need to know if the guardian board can read my complaint against Kysa immediately.

My daughter has reported that she has been introduced to sexual games from another child and that the other child has been touching her repeatedly in her vaginal area. DCYF has been contacted. My husband was notified and I requested that he attend an immediate counseling session, but he would not go. I had to go to the counseling session alone and the counselor would not meet with my daughter because my husband has not signed a release.

My husband has not called to speak to my daughter to see if she is okay and has informed me he's going to let Kysa deal with this.

Given the fact that Kysa has shown to be extremely biased, unethical, and unprofessional, I am very concerned about her possible involvement in this very difficult situation.

Please let me know what can be done.

Thank you,
Rochelle Coburn

## Kysa Crusco

| | |
|---|---|
| **From:** | Kysa Crusco <kysa@cruscolaw.com> |
| **Sent:** | Friday, February 28, 2014 11:50 AM |
| **To:** | 'James Brace' |
| **Subject:** | Dani Coburn |

Hi Chief Brace,

I am writing regarding an issue with the Coburn family that has come to my attention. I understand that you are out today, and I am heading out for vacation tomorrow for one week. I wanted to get this information to you to see what you thought about how to proceed.

Rochelle is reporting that Dani has told her that a peer, Dani's best friend, recently touched Dani's private parts. This allegedly occurred while Dani and her friend were having a playdate at Jim's home. I would note that I have heard a lot of complaints from Rochelle about this friend, from complaints about singing song lyrics Rochelle found inappropriate, bullying, physical altercations, etc. Rochelle has often argued that Dani should not play with this friend, and Rochelle believes Jim is dating the friend's mother. This is the first allegation that there are issues of a sexual nature.

I spoke with a CPSW at DCYF about how to proceed with this allegation. She suggested talking to the Child Advocacy Center. I spoke with Erin at the Manchester center, and she explained that their procedures required a referral from either the police or DCYF. I have my doubts about the truthfulness of the allegation Rochelle is making, but given the serious nature, it certainly has to be investigated. I think an interview for Dani in a safe environment with experienced professionals such as the CAC would be in her best interests.

Would you please follow up with me as soon as possible? I will be checking email on vacation, but I will not be available by phone.

**Kysa Crusco**

| | |
|---|---|
| From: | James Brace <j.brace@newbostonnh.gov> |
| Sent: | Friday, February 28, 2014 7:16 PM |
| To: | kysa@cruscolaw.com |
| Subject: | Re: FWD: Email |

They are perfectly capable of handling the case (State Police).

While I know the father of the accused child (Walter Knox), I have had no personal contact with the children. My contact has been limited to professional contacts with the child's mother (recent accident and a previous motor vehicle contact while the kids were in the car.)

However, there is no conflict with Sgt Widener which is why I advised earlier I would have him handle the complaint.

Either way, if she feels there is a conflict, State Police can and will often handle these types of cases.

I do think the Trooper should be privy to the entirety of the case so he has full disclosure and background. On two separate occasions, Rochelle was successful in DV petitions being issued by Judges who were not privy to the prior case history. By reading the courts last order related to the DV petition, it is clear the court recognized her attempt to manipulate the system and ultimately placed restrictions upon her to prevent it from happening again.

It goes without saying that our primary concern is Dani. If she was abused, our goal is to do everything within our power to protect her from further abuse. If that means stepping aside to allow State Police to conduct the investigation, then I have no problem agreeing to the referral.

I believe that you have attempted to act neutral and "see the whole picture" to make the best decisions for Dani and her parents. I and my Officers have also but because we have not agreed with Rochelle's assessments and/or statements, she has now resorted to attacks on your and our credibility.

I stand firm with every decision we have made and I am more than happy to take an oath and testify to the information we have provided. I am also certain every New Boston Officer feels the same way.

Let me know if there is anything else we can do.

**Kysa Crusco**

| | |
|---|---|
| From: | James Brace <j.brace@newbostonnh.gov> |
| Sent: | Friday, February 28, 2014 12:31 PM |
| To: | kysa@cruscolaw.com |
| Subject: | Re: Dani Coburn |

We can certainly open an investigation into the allegation. What I will tell you is about two weeks ago this mother, who Jim is allegedly dating, was involved in a motor vehicle accident in New Boston.

At the time, Jim responded to help pull her out of a snowbank and while on scene I had a conversation with him to which he specifically referred to Rochelle potentially making this allegation against him.

We also had a conversation about your recommendations and the report that was filed to which Jim emailed me later that evening. His assessment was that the report was fair and accurate

Regarding the allegations, He did not speak of any specific incident, he merely was saying that this would be the next allegation made against him in Rochelle's effort to attack his character or his ability to parent Dani appropriately.

The day before the hearing, I believe last month, Rochelle came into the police department and had what I would describe as a meltdown over the same issues we have gone round and round about. In short she said we were lying about many things. Her behavior was clearly based in her concern, or belief, that Jim was going to be awarded custody of Dani. She requested and was provided video of this lobby incident as well.

Given her behavior, followed by my conversation with Jim, which is now followed by this allegation, it does raise some red flags.

I presume that the location of the incident would be 20 Lincoln Dr. which would give New Boston the jurisdiction. I can open a case and refer it to Sgt. Widener and ask him to set up a CAC interview with Dani Rochelle and Jim as soon as possible.

It is a serious allegation and should be investigated appropriately.

I think it may be appropriate to have Rochelle file a formal complaint with our agency given the nature of the allegation.

If, given the red flags, the allegation is proven to be false, or made up, it would provide us an avenue to discuss charging Rochelle with a false report to law enforcement.

I guess the next step would be to find out if Rochelle is going to officially file the report and then for you to forward us any information you have at this point. Once we receive that information we will then take the next step...

I am available via email so if you reply I will try to get back to you today

James Brace

1

Chief of Police
Town of New Boston

# Kysa Crusco

**From:** Kysa Crusco <kysa@cruscolaw.com>
**Sent:** Friday, February 28, 2014 1:01 PM
**To:** 'James Brace'
**Subject:** RE: Dani Coburn

Thank you for your quick reply and the further information. The incident did allegedly occur in New Boston at Jim's home during a playdate last week. I have contacted Rochelle's attorney to discern whether Rochelle intends to file a formal complaint. Rochelle has taken steps to try to have Dani assessed through a therapist about this incident. However, I think that given the very serious nature, and without knowing who the therapist might be, the CAC would be the safest most appropriate place for Dani to be interviewed.

Thank you,

Kysa M. Crusco
Crusco Law Office, PLLC
116 S. River Road, Bld H
Bedford, NH 03110
(603) 627-3668
(603) 218-6498 (fax)
http://www.nhfamilylawblog.com
http://www.cruscolaw.com

This email message and any attachments are confidential and may be privileged. If you are not the intended recipient, notify Crusco Law Office, PLLC immediately -- by replying to this message or by sending an email to info@cruscolaw.com-- and destroy all copies of this message and any attachments.

**Kysa Crusco**

| | |
|---|---|
| **From:** | Rochelle Coburn <rockyp88@comcast.net> |
| **Sent:** | Friday, February 28, 2014 5:21 PM |
| **To:** | Kysa Crusco |
| **Cc:** | Frank Caine; Paul McDonough |
| **Subject:** | Email |

Kysa,

I read the email you sent to my attorney.

You stated, "I am writing to you today about allegations that Rochelle has recently made regarding sexual contact between Dani and her friend Riley. Rochelle has alleged that during a recent playdate Riley touched Dani's private parts and that Dani reported this to her mother. Rochelle has also said that Dani told her that Riley says she has a boyfriend who kissed her on her privates." You also stated, "This is a very serious allegation. I have reported the allegation to the New Boston Police Department, so that they feel it necessary they can make a referral to have Dani interviewed at the Chid Advocacy Center."

Are you insinuating that I reported false information? Your choice of wording sure sounds like it. I am copying this email to the board for review. Your license has expired and your application has not been reviewed by the board. Given the fact that you have a complaint pending, in regards to your conduct on this case, I did not contact you about the alleged abuse my daughter reported to an emergency room doctor.

Had Jim shown up to the appointment with Linda Bagshaw yesterday, he would have learned that we did not want the New Boston Police involved in this situation, as Chief Brace has a personal connection to Riley. He would have also learned that the alleged sexual contact that my daughter reported, had already been reported to DCYF by several people, including myself, and that we were waiting for a state trooper to set up a meeting for Danielle to be interviewed at CAC.

Perhaps you are unaware that I have been trained in dealing with these types of situations as well. Having been a special education teacher for three years, I am perfectly aware of the proper protocol for interviewing children who report sexual encounters with other children and/or adults. I am very aware of the seriousness of this situation as it involves a little girl (Riley) who may have been exposed to inappropriate behavior and/or abused by another child or an adult. I have dealt with this type of situation before and my professionalism and ethical behavior has never come into question.

I understand from reading your report that the New Boston Police Department has questioned my credibility. I would like you to know that I am taking the necessary steps to protect myself from the assassination attempts on my character. When all is said and done, I am confident that the people and agencies with true credibility issues will be dealt with appropriately.

Rochelle

1

**From:** kysa@cruscolaw.com

**Subject: RE: Email**

**Date:** February 28, 2014 6:51:28 PM EST

**To:** "Rochelle Coburn" <rockyp88@comcast.net>

**Cc:** "Frank Caine" <legalpug@aol.com>, "Paul McDonough" <mcduhnuh@gmail.com>, trish@raimomurphypc.com

Rochelle,

Thank you for your email. I have read it. However, I would ask that in the future, our communication go through your attorney. Thank you for your compliance with this request. Have a good evening,

Kysa M. Crusco, Esq.
Crusco Law Office, PLLC

Forwarded message
From: **Guardian Ad Litem Board** <Guardian.Litem@nh.gov>
Date: Mon, Mar 3, 2014 at 11:13 AM
Subject: RE: Kysa Crusco
To: Rochelle Coburn <rcoburn@uvei.org>


Rochelle,

The Board has no authority over the situation you are explaining.  They only have authority over whether or not a GAL violated a rule.  The worst they can do is revoke her license.  If you are looking for immediate action you should bring your concerns up with the court.

Jennifer

**Statement of Confidentiality:**  Some of the contents of this message, including any attachments, may be confidential.  Any unauthorized disclosure, reproduction, use or dissemination (either whole or in part) is prohibited.  If you are not the intended recipient of this message, please notify the sender immediately and delete the message from your system.

---------- Forwarded message ----------
From: **Rochelle Coburn** <rcoburn@uvei.org>
Date: Tue, Mar 4, 2014 at 10:09 AM
Subject: Re: Kysa Crusco
To: Guardian Ad Litem Board <Guardian.Litem@nh.gov>


I thought the board could look at my complaint in an emergency and if they find that she has violated the rules they could revoke her license immediately. She is now involved in the delay of my daughter getting counseling and she just met with the CAC to do an interview where she informed them that another child was rubbing her vagina. I can't get Kysa dismissed without a hearing. My daughter's emotional well being is at stake.

From: **Duncan, Susan** <Susan.Duncan@leg.state.nh.us>
Date: Wed, Mar 5, 2014 at 3:40 PM
Subject: FW: Help
To: "rcoburn@uvei.org" <rcoburn@uvei.org>
Cc: "'gal.board@nh.gov' (gal.board@nh.gov)" <gal.board@nh.gov>


Good afternoon Ms. Coburn:


The GAL Staff person is sick today and not in the office, thus my response.     The GAL Board can do nothing
other than remove the certification of a GAL.     If you have concerns about your child's well-being, this
needs to be brought to the attention of the Judge or Master who is handling your case – especially a concern
about improper physical contact with your daughter.     The court has the ability to act immediately to protect
your child.     The GAL Board does not have this ability or power.     Your legal counsel is able to guide you
in how to file a Motion with the court so that your daughter can obtain services.

From: **Rochelle Coburn** <rcoburn@uvei.org>
Date: Fri, Mar 21, 2014 at 11:12 AM
Subject: Complaint
To: Guardian Ad Litem Board <Guardian.Litem@nh.gov>


Hello Jen,

Can you tell me if the board is reviewing my complaint today and if so, when I can expect to hear from them about their decision?

Thank you,
Rochelle Coburn

Forwarded message

From: **Guardian Ad Litem Board** <Guardian.Litem@nh.gov>
Date: Mon, Mar 24, 2014 at 11:19 AM
Subject: RE: Complaint
To: Rochelle Coburn <rcoburn@uvei.org>


Rochelle,

You will be receiving a letter in the mail this week.

Jennifer


**Statement of Confidentiality:**  Some of the contents of this message, including any attachments, may be confidential.  Any unauthorized disclosure, reproduction, use or dissemination (either whole or in part) is prohibited.  If you are not the intended recipient of this message, please notify the sender immediately and delete the message from your system.





## State of New Hampshire
## Guardian ad Litem Board

25 Capitol Street - Room 120, Concord, New Hampshire 03301
TDD Access: Relay NH 1-800-735-2964
Web site: www.nh.gov/gal

Phone: (603) 271-1199
Fax: (603) 271-6600
E-mail: gal.board@nh.gov

March 24, 2014

Rochelle Coburn
1030 Shirley Ave
Goffstown, NH  03045

Dear Ms. Coburn:

Re: Complaint filed against GAL Kysa Crusco

The Board met on March 24, 2014 and reviewed your complaint filed against GAL Kysa Crusco, however, they are unable to make any determination regarding your complaint at this time and respectfully requests additional information so they may make an informed decision.

The board requests 4 copies of the items listed below:
1. All Court Orders
2. All GAL Reports
3. GAL Order of Appointment
4. GAL stipulation

All copies of items must be hard copy.  Electronic copies will not be accepted.

Pursuant to gal 203.01(e), failure to provide the specified material within 30 days will result in the complaint not being accepted for filing.  Thank you for your patience and cooperation.

Respectfully,

Jennifer E. Heinirch
GAL Board Secretary
On Behalf of the Board

**rockyp88@comcast.net**
to legalpug

Wed, Mar 26, 2014, 4:11 PM    

I received a letter from the board. They are requesting additional information. Did you get a complete copy of her file? They want all court orders, all GAL reports, the order of appointment, and her stipulation.

Rochelle Coburn <rockyp88@comcast.net>
Kysa Crusco
April 3, 2014 7:30:52 AM EDT
Guardian.Litem@nh.gov



Jen,

Please forward these emails to the guardian ad litem board. I asked my attorney to get a copy of Kysa's file (which I'm entitled to) and she has refused to comply with her request. In addition, she sent an email to my attorney accusing that was very unprofessional in my opinion.

I will have the additional documents that were requested to you by Monday or Tuesday next week.

Thank you,
Rochelle Coburn

From:
To:
CC:
Sent: 3/27/2014 12:20:32 P.M. Eastern Daylight Time
Subj: RE: Coburn

Hi Janina,

I am uncomfortable releasing the file in the middle of the investigation. Is there something specific that I could possibly provide to you? If not, I will need to file a motion for instructions with the court. Thanks,

Kysa M. Crusco, Esq.
Crusco Law Office, PLLC
116 S. River Road, Bld H
Bedford, NH 03110

This email message and any attachments are confidential and may be privileged. If you are not the intended recipient, notify Crusco Law Office, PLLC immediately — by replying to this message or by sending an email to                     and destroy all copies of this message and any attachments.

——— Original Message ———
Subject: Coburn
From:
Date: 3/27/14 10:30 am
To:
Cc:

Would you provide me with a copy of your file to date at your earliest convenience.

Thank you.

Janina

**From:** "Guardian Ad Litem Board" <Guardian.Litem@nh.gov>
**Subject: RE: Kysa Crusco**
**Date:** April 4, 2014 11:26:43 AM EDT
**To:** "Rochelle Coburn" <rockyp88@comcast.net>

Rochelle,

As stated in the letter all evidence that you would like the Board to see must be in hard copy with a total of 4 copies.

Jennifer
GAL Board Secretary

From: **Rochelle Coburn** <rcoburn@uvei.org>
Date: Fri, Apr 18, 2014 at 3:47 PM
Subject: Documents
To: Guardian Ad Litem Board <Guardian.Litem@nh.gov>


Hi Jennifer,

How late are you in today? I have more documents to drop off. Also, can you give me the address again?

Thanks,
Rochelle Coburn

From: **Guardian Ad Litem Board** <Guardian.Litem@nh.gov>
Date: Mon, Apr 21, 2014 at 11:32 AM
Subject: RE: Documents
To: Rochelle Coburn <rcoburn@uvei.org>


Hi Rochelle,

The Board had a meeting all afternoon Friday.  I did receive your box of documents today.  The Board will review them and make a decision at the May 16, 2014 meeting.  You will be notified by mail of their decision.

Jennifer

**Statement of Confidentiality:**  Some of the contents of this message, including any attachments, may be confidential.  Any unauthorized disclosure, reproduction, use or dissemination (either whole or in part) is prohibited.  If you are not the intended recipient of this message, please notify the sender immediately and delete the message from your system.

From: **Rochelle Coburn** <rcoburn@uvei.org>
Date: Tue, Apr 22, 2014 at 8:06 AM
Subject: Re: Documents
To: Guardian Ad Litem Board <Guardian.Litem@nh.gov>

Hi Jennifer,

Thank you for getting back to me. Will I be able to attend the May 16th meeting? I have a few things I'd like to say in person to the board.

Rochelle

From: **Guardian Ad Litem Board** <Guardian.Litem@nh.gov>
Date: Wed, Apr 23, 2014 at 11:25 AM
Subject: RE: Documents
To: Rochelle Coburn <rcoburn@uvei.org>


Rochelle,

You are welcome to attend the meeting on the 16th.  There is a public participation section at the beginning of the meeting.  The guidelines for this can be found at: http://www.nh.gov/gal/documents/public-comment-guidelines.pdf.

Complaints are heard in non-public session therefore you would not be allowed to hear the Board discussion about your complaint.  You will be notified by mail the week after.

I would suggest if you have something else you want the Board to take into account when reviewing your complaint that you send it to me in hard copy with a total of 4 copies.

Jennifer


**Statement of Confidentiality:**  Some of the contents of this message, including any attachments, may be confidential.  Any unauthorized disclosure, reproduction, use or dissemination (either whole or in part) is prohibited.  If you are not the intended recipient of this message, please notify the sender immediately and delete the message from your system.

**rockyp88@comcast.net**
to legalpug ▾

Wed, May 7, 2014, 4:29 PM  ☆  ↩  ⋮

She returned my check in the mail today. She said you are free to review her file and copies are not necessary. That's not her call. I say they are necessary. I hate that pos.

From: Rochelle Coburn <rockyp88@comcast.net>
Subject: Kysa's Letter
Date: May 8, 2014 5:53:59 AM EDT
To: Frank Caine <legalpug@aol.com>



Janina,

Kysa sent my check back with a letter that reads:

"Pursuant to an order of the Goffstown Family Division dated April 30, 2014. Attorney Stodolski may review the GAL's file. No copying is necessary at this time, therefore check 164 dated April 11, 2014 is being returned."

What order is she referring to? Was there a hearing? Why can't I have the documents copied if I want them? This is unbelievable!!!

Rochelle

From: Legalpug@aol.com
To: rockyp88@comcast.net
Sent:Fri May 9 02:44:47 UTC 2014
Subject: Re: Kysa

I will make a copy for you of the sneak motion and have the records available for you --the ones I have.  If I am not here they will be in the mail box in the entry way.  I am not making copies of them.

I want to bring the motion for reconsideration to court on Monday.

# Re: Kysa's email  ⅀  1 Court/1 By Year/2014/5 May 2014  ✕

**Frank Caine** <legalpug@aol.com>                                    Tue, May 13, 2014, 9:22 AM

to Rochelle  ▾

She has NEVER used that email address.

I have already asked Irene to call me

**From:** Legalpug@aol.com
**Subject: Re: FW: Coburn Motion**
**Date:** May 14, 2014 10:05:42 AM EDT
**To:** kysa@cruscolaw.com
**Cc:** rockyp88@comcast.net, trish@raimomurphypc.com, legalpug@aol.com

I have searched through my recent emails and my deleted emails on Jstodolski@aol.com and I did not receive your motion.

**From:** "Kysa Crusco" <kysa@cruscolaw.com>
**Subject: FW: Coburn Motion**
**Date:** May 14, 2014 11:49:35 AM EDT
**To:** <legalpug@aol.com>
**Cc:** <trish@raimomurphypc.com>, "gail" <gail@raimomurphypc.com>,
<rockyp88@comcast.net>, <lngbordr@comcast.net>

Janina,

You did not find when searching your inbox the second email with the motion that we sent 14 minutes later either? The first email sent at 10:58 am on April 16th had a sticky note on the first page of the scan, which Gail brought to Jessica's attention. That is the email that I forwarded to you yesterday. Jessica then rescanned the document without the sticky note and resent it below at 11:12 am on April 16th. I understand that Trish's office received the emails that day with the motion without issue, it is curious that you did not receive either of the emails sent that day to you with a copy of the motion.

Kysa M. Crusco
Crusco Law Office, PLLC

In a message dated 5/15/2014 11:32:47 A.M. Eastern Daylight Time, rockyp88@comcast.net writes:

> This is fucking bullshit!!!! I requested an emergency hearing a month ago and now Irene is telling me there won't be any judges to sign the referee's decision until Monday at the earliest. Why the he'll can't they bring in a judge today??? You need to call me!!!
>
> Sent from Xfinity Connect Mobile App

**rockyp88@comcast.net**
to Frank ▾

Thu, May 15, 2014, 12:36 PM   ☆      

Then why can't they get a judge to come in to sign it? It was an emergency motion. Can't they send it to a judge in a different courthouse? This is creating a nightmare for several people. Jack's mom has relatives staying at her house and Jack has a two bedroom house with three kids. He's already taking Shayne temporarily and I'm imposing on Barbara.

From: Frank Caine
To: rockyp88
Sent: May 15, 2014 at 1:45 PM
Subject: Re: Car

I called and asked the supervisory judge for assistance.

**From:** Rochelle Coburn [mailto:rcoburn@uvei.org]
**Sent:** Friday, May 16, 2014 10:57 AM
**To:** Guardian Ad Litem Board
**Subject:** Kysa Crusco's

Hi Jennifer,

When will the outcome of today's meeting be available? Can you please send the mailed response to my attention at 35 Shirley Park Road in Goffstown, NH 03045. That is the new temporary location where I'm residing.

Thank you,
Rochelle Coburn

From: **Rochelle Coburn** <rcoburn@uvei.org>
Date: Mon, May 19, 2014 at 10:09 AM
Subject: Board Meeting
To: Guardian Ad Litem Board <Guardian.Litem@nh.gov>

Hello Jen,

Just checking to see if the board met on Friday regarding my complaint and if I will receive anything in the mail this week?

Thank you,
Rochelle Coburn

From: **Guardian Ad Litem Board** <Guardian.Litem@nh.gov>
Date: Mon, May 19, 2014 at 11:23 AM
Subject: RE: Kysa Crusco's
To: Rochelle Coburn <rcoburn@uvei.org>

Rochelle,

You will be receiving a letter in the mail this week with the Board's decision.  I will change the address to the one below.

Jennifer

**Statement of Confidentiality:**  Some of the contents of this message, including any attachments, may be confidential.  Any unauthorized disclosure, reproduction, use or dissemination (either whole or in part) is prohibited.  If you are not the intended recipient of this message, please notify the sender immediately and delete the message from your system.



# State of New Hampshire
# Guardian ad Litem Board

25 Capitol Street - Room 120, Concord, New Hampshire 03301
TDD Access: Relay NH 1-800-735-2964
Web site: www.nh.gov/gal

Phone: (603) 271-1199
Fax: (603) 271-6600
E-mail: gal.board@nh.gov

May 19, 2014

Rochell Coburn
35 Shirley Park Road
Goffstown, NH 03045

Dear Ms. Coburn:

RE: Complaint filed against GAL Kysa Crusco       Docket #: 2014-C0003

On May 16, 2014 the Guardian ad Litem Board met and carefully reviewed your complaint. The Board voted that your complaint be dismissed pursuant 203.03:a:9, this is an ongoing case and good cause was not shown in the evidence submitted, therefore, there will be no further investigation at this time. The Board recommends all complaints for current cases be directed to the court.

The Board cannot interfere with court proceedings. As the recipient is not in danger, there is no good cause to investigate the matter during the pendency of the court proceedings.

We recognize this has been a difficult time for you and your family. If you would like to request an oral argument, please be advised you have 10 days to file an oral argument request form 29 with the Board. The form can be found at http://www.nh.gov/gal/documents/gal-form29.pdf.

Please review the GAL rules for requesting an oral argument, also found on our website.

> Gal 203.03 (e) The oral argument on dismissal or nonacceptance shall:
>
> (1) Not be evidentiary in nature, unless the board determines that evidence is necessary in order for it to understand or fairly assess the complainant's argument;
> (2) Relate solely to whether or not the board's dismissal or nonacceptance was proper according to the applicable standards for dismissal or nonacceptance;
> (3) Consist of not more than 10 minutes of oral argument by the complainant or his or her representative, unless the board concludes that additional time or argument from other individuals is needed in order for it to understand or fairly assess the complainant's argument;
> (4) Consist of argument which:
>> a. Is presented in a manner that is not abusive or disruptive;
>> b. is relevant to the specific purpose for which the oral argument was scheduled; and
>> c. Does not restate a matter that has already once been stated;

Respectfully,

Jennifer E. Heinrich
GAL Board Secretary
On Behalf of the GAL Board

CC: Kysa Crusco

---------- Forwarded message ----------
From: **Rochelle Coburn** <rcoburn@uvei.org>
Date: Mon, May 19, 2014 at 11:31 AM
Subject: Re: Kysa Crusco's
To: Guardian Ad Litem Board <Guardian.Litem@nh.gov>

Thank you!

On May 21, 2014, at 11:43 AM, Rochelle Coburn <teacher88r@gmail.com> wrote:

> Just spoke to Irene and she said the judge signed the order but she can't tell me anything. It went out in the mail today. Can you please call her or find out what the heck the order states. Can I go home? Am I getting any support?

## Kysa Crusco

| | |
|---|---|
| **From:** | Kysa Crusco <kysa@cruscolaw.com> |
| **Sent:** | Wednesday, May 21, 2014 4:01 PM |
| **To:** | trish@raimomurphypc.com; legalpug@aol.com |
| **Cc:** | gail (gail@raimomurphypc.com) |
| **Subject:** | Coburn - GAL Board |
| **Attachments:** | Coburn - Letter from GAL Board - 5-21-14.pdf |

Dear Trish and Janina,

The GAL Board has dismissed Rochelle's complaint and closed the case. I have attached a copy of the letter. Thank you,

Kysa M. Crusco

On May 22, 2014, at 4:59 PM, sarah avery-leaf <sarahaveryleaf@gmail.com> wrote:

> Rochelle has requested that I speak with her son Shayne. In the interest of equivalence, it might be useful if I either spoke to both Shayne and Derek, or to neither one.

> Jim, release forms for both Derek and Shayne have been signed by Rochelle. Would you like to give your permission for me to speak to them? If so, please also give me a telephone number for Derek.

> Thank you,

> --

> Sarah Avery-Leaf, PhD

**From:** Ingbordr <Ingbordr@comcast.net>

**Subject: Re: collaterals**

**Date:** May 22, 2014 6:45:14 PM EDT

**To:** "sarahaveryleaf@gmail.com" <sarahaveryleaf@gmail.com>

**Cc:** James R Coburn <Ingbordr@comcast.net>, Rochelle Coburn <rockyp88@comcast.net>

Hi Dr. Avery-Leaf,
I spoke with my son Derek and he is open to talking with you if needed.  Because of the time difference (he is on the west coast) and his busy schedule, I would suggest you contact him via email to arrange a time convenient for both of you.  His contact info is as follows:
email - derekacoburn@gmail.com
cell - (805) 908-1832

Regards,
Jim Coburn

On May 22, 2014, at 8:36 AM, Rochelle Coburn <teacher88r@gmail.com> wrote:

I have to go to my evaluation in Portsmouth after work. Can you please call Irene and find out if I'm allowed back in my home, if I'm getting any support and if we are getting an evidentiary hearing for Kysa? Please I really need answers.

# Kysa Crusco

**From:** Trish Murphy <trish@raimomurphypc.com>
**Sent:** Tuesday, May 27, 2014 1:55 PM
**To:** kysa; Janina Stoldolski; legalpug@aol.com
**Cc:** gail
**Subject:** Coburn

Janina
Kysa
Just got an copy of an email from Sarah Avery-Leaf PhD to my client saying that Rochelle has requested that she talk her son Shayne.  She said "In the interest of equivalence, it might be useful if I either spoke to both Shayne and Derek (Jim's son), or to neither one"
I have never seen a psyche evaluation go so far afield, but Jim has agreed, understanding that he does not want any challenges to the evaluation process.
Personally, I think it is unproductive and completely unnecessary.
Trish Murphy


--
Patricia A. Murphy, Esquire
Raimo & Murphy, PC
67 Central St.
Manchester, NH 03101
(603) 625-2152

## Kysa Crusco

| | |
|---|---|
| **From:** | Kysa Crusco <kysa@cruscolaw.com> |
| **Sent:** | Wednesday, May 28, 2014 1:31 PM |
| **To:** | legalpug@aol.com; trish@raimomurphypc.com |
| **Subject:** | release for counselor - Coburn |

Janina and Trish,

Would you confirm with me the name, address and telephone number of Dani's counselor and that each of your clients have signed releases for me to speak with her?

# Fwd: release for counselor - Coburn



 1 Court/1 By Year/2014/5 May 2014 ×

 **Legalpug@aol.com**

Wed, May 28, 2014, 2:46 PM      

to me ▾

I think she can get the written record but I do not want her speaking to the therapist.

Subj:     **Re: release for counselor - Coburn**
Date:     5/28/2014 8:53:40 P.M. Eastern Daylight Time
From:     teacher88r@gmail.com
To:       Legalpug@aol.com

I have not signed the releases for her to speak to Dani's therapist. She will twist everything around.

**Kysa Crusco**

| | |
|---|---|
| **From:** | Frank Craine <legalpug@aol.com> |
| **Sent:** | Thursday, May 29, 2014 5:56 AM |
| **To:** | Kysa Crusco |
| **Cc:** | Frank Caine |
| **Subject:** | Fwd: Address |

Per your request.

Sent from my iPad

Begin forwarded message:

> **From:** Rochelle Coburn <teacher88r@gmail.com>
> **Date:** May 28, 2014 8:44:38 PM EDT
> **To:** Janina Stodolski <legalpug@aol.com>
> **Subject: Address**
>
> I am staying with Jack's mom until the divorce is finalized. Her name is Barbara Carbonneau and her address is 35 Shirley Park Road in Goffstown, NH.
>
> Dani has her own room here and I have my own room as well. It's a beautiful house on the lake and Dani is very happy here. It's the same street I was on before and Danielle has several friends here that she has been playing with for over a year. Kysa left that out of her preliminary report.
>
> Jack is not living here. He has his own house and took Shayne in. Shayne has applied to get into the military and is waiting to hear back from them.

## Kysa Crusco

**From:** Kysa Crusco <kysa@cruscolaw.com>
**Sent:** Monday, June 16, 2014 5:09 PM
**To:** legalpug@aol.com; trish@raimomurphypc.com
**Subject:** Coburn - counselor release

Janina,

I heard from Dani's counselor today. Rochelle has not signed a release. Please direct her to sign a release this week and confirm that she has done so to me by email. I will find it necessary to file a motion to compel at the end of this week if Rochelle does not sign the release.

Thank you,

Kysa M. Crusco
Crusco Law Office, PLLC
116 S. River Road, Bld H
Bedford, NH 03110
(603) 627-3668
(603) 218-6498 (fax)
http://www.nhfamilylawblog.com
http://www.cruscolaw.com

On Tuesday, June 17, 2014, Kysa Crusco <kysa@cruscolaw.com> wrote:

Jessica sent a link to the Share File with all the Coburn documents (orders, pleadings, GAL Report, Rochelle's complaint to the GAL Board). The GAL Board complaint is quite lengthy (about 300 pages, so you might not want to print that). However, I am including all the documents so that you can get a feeling for the litigation, allegations, etc. along with the positions that the Court has taken and made orders on.

Kysa M. Crusco

**Kysa Crusco**

| | |
|---|---|
| **From:** | sarah avery-leaf <sarahaveryleaf@gmail.com> |
| **Sent:** | Tuesday, June 17, 2014 4:17 PM |
| **To:** | Kysa Crusco |
| **Subject:** | Re: Coburn documents |

Yes--thanks for that. Will review the GAL report, which I printed. Likely that I will review the other documents online.

Subj:       **Kysa**
Date:       6/19/2014 11:17:54 A.M. Eastern Daylight Time
From:       teacher88r@gmail.com
To:         legalpug@aol.com

Please send me the wording you want me to use on the documents for the counselor. I am going to swing by there after work.

Also, I still need you to get the credit card statements from boa, citibank, and chase as well as statements from paypal. The addresses are on his credit report. If you need them just let me know,

**Frank Caine** <legalpug@aol.com>
to me

Thu, Jun 19, 2014, 12:38 PM

Written reports only.  Oral communications shall be in my presence or that of my attorney.
Sent from my iPhone

# Kysa Crusco

**From:** Frank Craine <legalpug@aol.com>
**Sent:** Friday, June 20, 2014 12:27 PM
**To:** Kysa Crusco
**Cc:** Frank Caine
**Subject:** Coburn

Rochelle signed the release you requested yesterday.

Janina Stodolski
Sent from my iPad

# Kysa Crusco

**From:** Trish Murphy <trish@raimomurphypc.com>
**Sent:** Friday, June 20, 2014 5:04 PM
**To:** kysa@cruscolaw.com
**Subject:** Re: Coburn GAL Invoice

Perfect for me- not so much for you since I doubt she will pay you.
Sorry
T

**From:** "Kysa Crusco" <kysa@cruscolaw.com>

**Subject: Dr. Avery-Leaf's evaluation**

**Date:** August 1, 2014 7:16:40 PM EDT

**To:** <rockyp88@comcast.net>, <trish@raimomurphypc.com>

**Cc:** "gail" <gail@raimomurphypc.com>, <lngbordr@comcast.net>

Counsel & Parties,

I spoke with Dr. Avery-Leaf today. She is working on finalizing the report. As she does, she would like both parties to pay their final balances. Please be in touch with her to do so.

Kysa M. Crusco
Crusco Law Office, PLLC

**From:** Rochelle Coburn <rockyp88@comcast.net>
**Subject: Re: Dr. Avery-Leaf's evaluation**
**Date:** August 2, 2014 11:36:42 AM EDT
**To:** Kysa Crusco <kysa@cruscolaw.com>

Kysa,

I already provided you with a new email address and home address. I would appreciate it if you would stop sending emails to the rockyp88 address as I am no longer using it.

Regards,
Rochelle

On Tuesday, August 5, 2014, <kysa@cruscolaw.com> wrote:
Is the report ready to take a peek at yet? Thanks!

Kysa M. Crusco, Esq.
Crusco Law Office, PLLC
24 Eastman Ave, Ste C4
Bedford, NH 03110
www.cruscolaw.com
www.nhfamilylawblog.com


This email message and any attachments are confidential and may be privileged. If you are not the intended recipient, notify Crusco Law Office, PLLC immediately -- by replying to this message or by sending an email to info@cruscolaw.com-- and destroy all copies of this message and any attachments.

-------- Original Message --------
Subject: Re: Coburn
From: "sarah avery-leaf" <sarahaveryleaf@gmail.com>
Date: 8/5/14 1:31 pm
To: "kysa@cruscolaw.com" <kysa@cruscolaw.com>

Sure--I will send via email, plus mail hard copies, to you when I get back to my office (tonight or tomorrow).

No response from either party to my email yesterday, btw.

Talk soon,
Sarah

On Tue, Aug 5, 2014 at 6:35 PM, <kysa@cruscolaw.com> wrote:
Great. I'm up in Canada now for a swim meet and doing some writing on my downtime. I emailed the attorneys and parties about payment.

Kysa M. Crusco, Esq.
Crusco Law Office, PLLC
24 Eastman Ave, Ste C4
Bedford, NH 03110
www.cruscolaw.com
www.nhfamilylawblog.com


This email message and any attachments are confidential and may be privileged. If you are not the intended recipient, notify Crusco Law Office, PLLC immediately -- by replying to this message or by sending an email to info@cruscolaw.com-- and destroy all copies of this message and any attachments.

## Kysa Crusco

**From:**      sarah avery-leaf <sarahaveryleaf@gmail.com>
**Sent:**      Wednesday, August 06, 2014 1:39 PM
**To:**        Kysa Crusco
**Subject:**   Re: Re: Coburn

OK--hard copies were sent out. Am emailing you (in 2 separate emails) the two reports. Hopefully the formatting will stay intact. Essentially, I conclude:

1. Neither party is full on crazy but one party (R) shows deficits that extend beyond the marital realm.

2. Therapists are deficient (except maybe D's therapist) and so better ones are needed for both parties.

3. Parent coordinator and structured plan to minimize if not eliminate any interaction between parents

Enjoy your time in Canada!


Sarah Avery-Leaf, PhD
1 Middle St., Suite 2
Portsmouth, NH 03801

603-868-5579 tel
603-766-0009 fax

## Kysa Crusco

**From:** Kysa Crusco <kysa@cruscolaw.com>
**Sent:** Friday, August 08, 2014 3:47 PM
**To:** 'sarah avery-leaf'
**Subject:** FW: Dr. Avery-Leaf

See below. If worst comes to worst, I can ask the court for an order compelling the payment from both parties.

Kysa M. Crusco
Crusco Law Office, PLLC
24 Eastman Ave, Ste C4
Bedford, NH 03110
(603) 627-3668
(603) 218-6498 (fax)
http://www.nhfamilylawblog.com
http://www.cruscolaw.com

This email message and any attachments are confidential and may be privileged. If you are not the intended recipient, notify Crusco Law Office, PLLC immediately -- by replying to this message or by sending an email to info@cruscolaw.com-- and destroy all copies of this message and any attachments.

## Kysa Crusco

**From:** Rochelle Coburn <teacher88r@gmail.com>
**Sent:** Wednesday, August 13, 2014 12:12 PM
**To:** sarahaveryleaf@gmail.com; Kysa Crusco
**Subject:** Payment

Hi Dr. Avery-Leaf,

I borrowed enough money to pay the invoice you sent me. I'm mailing a check today. Jim is responsible for all other costs, including the the GAL fees. He is supposed to use our joint funds to pay those costs, as I am not receiving any child support or alimony at this time. I'm sorry he sent you the email in regards to the court order not being clear. I'm sure the judge will be thrilled (not really) to have to clarify that with Mr. Coburn before he pays you. I'll will contact the courthouse tomorrow for clarification.

Please send a copy of my report to my address:
Rochelle Coburn
35 Shirley Park Road
Goffstown, NH 03045

Thank you,
Rochelle Coburn
603-325-5874

On Monday, August 18, 2014, Kysa Crusco <kysa@cruscolaw.com> wrote:

Rochelle,

As I am sure you are well aware and you have pointed out to me many times, my job is to act in Dani's best interest. It is not in her best interest for her to see her parents argue about expenses or exchange money in front of her. The two of you can find alternative ways to accomplish the same task without involving Dani. As I suggested, direct deposit, bank transfers or mailing a check will suffice. I am giving you feedback on this co-parenting issue, and I hope that you will consider it thoughtfully and put it to good use.

Kysa M. Crusco

**Rochelle Coburn** <teacher88r@gmail.com>                    Mon, Aug 18, 2014, 4:16 PM        
to Kysa

Kysa,
I will remind you again that I do not argue with Jim or even speak to Jim in front of Danielle. I have many witnesses who have seen us during the exchanges. Any suggestion, from you, that I will argue with Jim in front of Danielle is unacceptable. Danielle will not be harmed if Jim gives me a check.

Rochelle

**Rochelle Coburn** <teacher88r@gmail.com>     Mon, Aug 18, 2014, 4:30 PM      

to Kysa ▾

**Kysa,**

I will be addressing this issue with Danielle's counselor. My guess is that he will agree with me that it would be healthy for Danielle to see that her father is complying with a court order, rather than denying her the basic necessities. Brian is the expert when it comes to Danielle's psychological well being, I will get advice from him as he has always been fair and unbiased.

Rochelle

> -----Original Message-----
> From: Trish Murphy [mailto:trish@raimomurphypc.com]
> Sent: Thursday, August 21, 2014 3:50 PM
> To: kysa; gail
> Subject: coburn
>
> ??? Report???
>
>

--
Patricia A. Murphy, Esquire
Raimo & Murphy, PC
67 Central St.
Manchester, NH 03101
(603) 625-2152

Kysa Crusco wrote:
> Left a message with Gail - September 8th :)
>
> Kysa M. Crusco
> Crusco Law Office, PLLC
> 24 Eastman Ave, Ste C4
> Bedford, NH 03110
> (603) 627-3668
> (603) 218-6498 (fax)
> http://www.nhfamilylawblog.com
> http://www.cruscolaw.com

**Rochelle Coburn** <teacher88r@gmail.com>                    Mon, Aug 25, 2014, 2:03 PM   

to Janina ▼

Jim had Danielle's friend over again and dani just told me the other girl is now kissing her on the lips and wants dani to play the boyfriend. They were upstairs and Jim was downstairs again. Why won't he supervise and how do I put an end to this?

**From:** Rochelle Coburn [mailto:teacher88r@gmail.com]
**Sent:** Wednesday, August 27, 2014 6:29 AM
**To:** Kysa Crusco; Jennifer Chislett; Marc Beaudoin
**Subject:** Danielle Coburn

Kysa,

I'm writing to let you know that Danielle reported some information to me over the weekend, which was shared with her therapist Brian Taracena. At the advice of Dr. Taracena, I reported the information to DCYF and gave them his contact information.

At this time I am requesting that you not intervene, the way you did last time, and allow the proper investigation to take place. You will be copied on all the documentation, so you can use it for your final report.

Thank you,
Rochelle Coburn

RE: Danielle Coburn  ⟩  1 Court/1 By Year/2014/8 Aug 2014 ✕

 

◄ **Kysa Crusco** <kysa@cruscolaw.com>
to me, trish, gail ▾

Wed, Aug 27, 2014, 9:58 AM  ☆  ◄  ⋮

Rochelle,

I will continue to act as Danielle's GAL and take what actions in my discretion that I feel I must take. If that includes speaking with DCYF, the therapist or the State Police, I will do so.

Kysa M. Crusco
Crusco Law Office, PLLC
24 Eastman Ave, Ste C4
Bedford, NH 03110
(603) 627-3668
(603) 218-6498 (fax)
http://www.nhfamilylawblog.com
http://www.cruscolaw.com

This email message and any attachments are confidential and may be privileged. If you are not the intended recipient, notify Crusco Law Office, PLLC immediately -- by replying to this message or by sending an email to info@cruscolaw.com-- and destroy all copies of this message and any attachments.

On 8/27/2014 10:32 AM, Kysa Crusco wrote:

Hi Gail,

I would consider supporting an emergency motion to change custody. If you speak with Trish, please let her know and we can discuss further.

Thanks,

Kysa M. Crusco
Crusco Law Office, PLLC
24 Eastman Ave, Ste C4
Bedford, NH 03110
(603) 627-3668
(603) 218-6498 (fax)
http://www.nhfamilylawblog.com
http://www.cruscolaw.com

This email message and any attachments are confidential and may be privileged. If you are not the intended recipient, notify Crusco Law Office, PLLC immediately -- by replying to this message or by sending an email to info@cruscolaw.com-- and destroy all copies of this message and any attachments.

**From:** gail <gail@raimomurphypc.com>
**Sent:** Wednesday, August 27, 2014 10:50 AM
**To:** Kysa Crusco
**Subject:** Re: Coburn

Hi Kysa - I will let Trish know.  Jim was placing a call to Brian and as soon as hears back from him he will be in touch.

Gail

From: **Rochelle Coburn** <teacher88r@gmail.com>
Date: Wed, Aug 27, 2014 at 12:29 PM
Subject: Re: Danielle Coburn
To: Kysa Crusco <kysa@cruscolaw.com>

Kysa,

You are prohibited from speaking to the therapist unless I am present. It's important that you refrain from making false statements about my actions, like you did before. Dr. Taracena is the expert, and he told me to call DCYF, just as Linda Bagshaw did before. Your statement that I was going from agency to agency to get the answers I wanted was totally wrong and it will not be tolerated again. My daughter has been through enough over the past couple of years and you have done nothing to help protect her. Your alliance with Jim has caused her harm and I do plan to take every legal action possible to hold you accountable.

*Okay to send /*
*104517 BJT*   *ok*
*BJ*



### THE COUNSELING CENTER

## AUTHORIZE TO RELEASE OR OBTAIN INFORMATION

Name: _Danielle Coburn_ DOB: _1-18-08_ TCCON ACCT # _104517_ DOC ID _BJT_

## TO OBTAIN RECORDS OR INFORMATION FROM OUTSIDE AGENCY OR PROVIDER:

_____(INITIAL) I hereby authorize the following outside agency/provider: _____ to
release the following records and/or information regarding the above name patient to The Counseling Center.

**Please check any/all that apply:** _____ Copy of All Medical/Psychiatric/Behavioral Health Records
                                          _____ Verbal Disclosure/Case Discussion and Information, Upon Call from TCCON Provider
                          **OR:**
_____ Psychological Testing Records: _____ Medication List: _____ Admission/Discharge Summaries
_____ Medical/Psychiatric/Behavioral Health Records Limited to: _____ Medication List: _____ Labs: _____ Last Physical
_____ Copy of Medical and/or Psychiatric/Behavioral Health Records, if requested, at a future date (please do not send records now)
_____ Other:
_____ Limit Records/Info Released to the following Dates: _____ Last 12 Months _____ Last 6 Months; Or : _____

## TO RELEASE COUNSELING CENTER RECORDS OR INFORMATION:

_R.C_(Initial) I hereby authorize The Counseling Center to release protected health information from the clinical record of the
identified patient to the following individual(s) or agency: _Kysa Crisco + Janina Stodolski_

**Please check any/all that apply:** _____ Copy of All Medical/Psychiatric/Behavioral Health Records
                                          _____ Verbal Disclosure/Case Discussion and Information, Upon Call from Outside Provider
                          **OR:**
_____ Psychological Testing Records: _____ Medication List: _____ Admission/Discharge Summaries
_____ Medical/Psychiatric/Behavioral Health Records Limited to: _____ Medication List: _____ Labs; _____ Last Physical
_____ Copy of Medical and/or Psychiatric/Behavioral Health Records, if Requested, at a future date (please do not send records
now)
__X__ Other: _Behavioral Health records in written form only_ ↑ No verbal communica-
                                                                  unless I am      tion
_____ Limit Records/Info Released to the following Dates: _____ Last 12 Months _____ Last 6 Months; Or: _Present or my_
                                                                                               _attorney is present._

A copy or facsimile of this authorization shall have the same force as the original. This authorization is valid until the end of my treatment at _____   ↑All written
The Counseling Center, unless otherwise revoked. I understand I can revoke this release at any time in writing; however, my revocation    reports
would not cover action already taken on the basis of this authorization. I further authorize the delivery of this release document to its   must be
intended recipient via U.S. Mail or fax.                                                                                    copied to

Treatment may not be denied because of refusal to sign this authorization, unless the services are being provided for the purpose of providing   Janina
information to the identified recipient, or if refusal to authorize release of this information would compromise competent and informed           Stodolski.
clinical care. Information released based on this authorization may be subject to re-release by the recipient. **Federal regulations and state**   as well.
statues prohibit the disclosure of certain information, such as information regarding alcohol and drug abuse treatment, sexually
transmitted disease and HIV status, without separate and specific written consent. Please leave blank below if you do not consent.

**I authorize the release of the following specific information if contained in my medical/psychiatric/behavioral health record:**

Initial: _____ Release alcohol/drug abuse information
Initial: _____ Release sexually transmitted disease information
Initial: _____ Release HIV status
Signature: _Rochelle Coburn_ Date: _6-19-14_

Relationship to patient if not signed by patient: _Mother_ Witness: _Stodolski_ Date: _6/19/14_ TO
Address and phone number of provider(s) or recipient(s) of information _Janina Stodolski * mail To_
_63 High St. Manchester, NH 03104_
Name Counseling Center Provider(s): _Brian Tarricone_

_Janina Stodolski email - legalpug@aol.com_

The Counseling Center * One Main St. * Nashua, NH 03064
Ph: 603-883-0005 * Fax: 603-883-0007

RE: Danielle Coburn  ⟩  1 Court/1 By Year/2014/8 Aug 2014 ×          

↩  **Kysa Crusco** <kysa@cruscolaw.com>                    Wed, Aug 27, 2014, 12:49 PM   ☆   ↩   ⋮
to me, gail, trish ▾

Rochelle,

I will not accept such communication from you with threats and statements meant to intimidate me. If you persist, you will need to send communication through the postal mail and any mail that crosses those boundaries will be returned to you.

Kysa M. Crusco
Crusco Law Office, PLLC
24 Eastman Ave, Ste C4
Bedford, NH 03110
(603) 627-3668
(603) 218-6498 (fax)
http://www.nhfamilylawblog.com
http://www.cruscolaw.com

This email message and any attachments are confidential and may be privileged. If you are not the intended recipient, notify Crusco Law Office, PLLC immediately -- by replying to this message or by sending an email to info@cruscolaw.com-- and destroy all copies of this message and any attachments.

**Rochelle Coburn** <teacher88r@gmail.com>          Wed, Aug 27, 2014, 4:36 PM      

to Kysa ▾

Kysa,

When it comes to well being of my daughter, I will take the necessary steps to ensure her safety. At this time there is an investigation pending with DCYF, in regards to Danielle's safety, while in her father's care. I have requested in the past that Jim refrain from allowing any contact between the two girls, while in his care, because I know he leaves them alone together. Given the fact that the girls admitted everything and have now been left alone again, while in Jim's care, and have engaged in inappropriate behavior, her therapist advised me to contact DCYF he informed me that he felt the girls should have no contact at this time. When I found out about the most recent incident, I notified Jim right away and asked him to promise that he would not leave the two girls alone together. He has not provided me that guarantee in any form, written or verbal, so I will not be returning Danielle to him this evening, unless I get something in writing from him that states he will not allow Riley Knox and Danielle to see each other until the appropriate supports are set by DCYF and or the court, to ensure Danielle's safety.

I called your office to discuss, but you were not in. I left a message with your secretary.


Rochelle

Court Order  ⅀  1 Court/1 By Year/2014/8 Aug 2014 ✕                        🖨  ↗

↩ **Jessica Hanna Lemieux** <jessica@cruscolaw.com>              Wed, Aug 27, 2014, 4:38 PM  ☆  ↩  ⋮
to me, Kysa ▾

Dear Rochelle,

Pursuant to our recent telephone conversation, I have spoken with Attorney Crusco regarding your request. She informed me that she would not be calling you back, and that you should address any issues you wish to discuss with her via email. She will respond either later this evening or tomorrow. She stated that she is not able to change a court order, and that you need to follow the court order that is in place.

Thank you for your attention to this matter, and please feel free to contact our office if you have any questions.

Sincerely,

Jessica Hanna Lemieux
Assistant to Kysa M. Crusco, Esq.
Crusco Law Office, PLLC
24 Eastman Avenue, Ste. C4
Bedford, NH 03110
603-627-3668 (Phone)
603-218-6498 (Fax)
http://www.nhfamilylawblog.com
http://www.cruscolaw.com

This email message and any attachments are confidential and may be privileged. If you are not the intended recipient, notify Crusco Law Office, PLLC immediately -- by replying to this message or by sending an email to info@cruscolaw.com-- and destroy all copies of this message and any attachments.

 **Rochelle Coburn** <teacher88r@gmail.com>        Wed, Aug 27, 2014, 6:12 PM      

to Kysa ▾

Kysa,

Jim went to the police, and the situation has been temporarily resolved. He agreed to tell the police that there would be no contact between Riley and Danielle, until DCYF finishes their investigation. It was unnecessary to get the police involved as that was what I requested of him a few days ago. If he would have given me the same guarantee, when I requested it, I would have returned her on time.

Rochelle

## Ex Parte  ⟩  1 Court/1 By Year/2014/8 Aug 2014 ×



 **gail** <gail@raimomurphypc.com>
to me ▾

 Thu, Aug 28, 2014, 12:08 PM    

Ms. Coburn - please see the attached Ex Parte Motion, Proposed Order,
and Affidavit of Compliance that Attorney Murphy is on her way to Court
to file now.

--
Gail Hutzley,  Legal Assistant
Raimo and Murphy, PC
67 Central Street
Manchester, NH 03103
Telephone: (603) 625-2152
Facsimile: (603) 626-4711
gail@raimomurphypc.com

IMPORTANT NOTICE: The information in this transmission is privileged and confidential, and is intended only for the recipient(s) listed above. If you are neither the intended
recipient(s) nor a person responsible for the delivery of this transmission to the intended recipient(s), you are hereby notified that any unauthorized distribution or copying of this
transmission is prohibited. If you have received this transmission in error, please notify us immediately at (603) 625-2152.

📄 **8-28-14 Ex Parte**

> On Aug 29, 2014, at 12:31 PM, Rochelle Coburn <teacher88r@gmail.com> wrote:
>
> Dr Avery never called Jim's psychiatrist and I never received records from his psychiatrist. Do you have a release from Jim to get medical records? Something is not right. Sarah contacted my counselor and psychiatrist but only contacted Jim's counselor.
>
> Have anymore financial documents come in?

On Fri, Aug 29, 2014 at 10:03 AM, Rochelle Coburn <teacher88r@gmail.com> wrote:

Dr. Avery-Leaf,

Will you please provide an explanation as to why you did not contact Jim's psychiatrist to gain information about his mental health? Is it because Jim did not authorize it or did you not feel it was necessary?

Did you receive any medical records from Jim's psychiatrist to review?

Rochelle Coburn

On Friday, August 29, 2014, sarah avery-leaf <sarahaveryleaf@gmail.com> wrote:

To All Parties:

Collaterals were interviewed by me based either on:

1. My request to speak to any current  therapists

2. Either party's request

I hold a similar policy with regard to documents, i.e. there are certain documents I ask to review but also review documents at the request of either party.

I hope this review of these policies is helpful.

Thank you,

Sarah Avery-Leaf, PhD
1 Middle St., Suite 2
Portsmouth, NH 03801

603-868-5579 tel
603-766-0009 fax

From: **Rochelle Coburn** <teacher88r@gmail.com>
Date: Fri, Aug 29, 2014 at 12:57 PM
Subject: Re: Evaluation
To: sarah avery-leaf <sarahaveryleaf@gmail.com>

Dr. Avery,

I did request that you speak to my son and to Jim's psychiatrist. In addition, you agreed in your office to review all the documentation I provided, and I told you I would pay you separately. Can you please explain why you chose to go against the agreement we reached in your office?

Rochelle Coburn

On Sat, Aug 30, 2014 at 10:19 AM, Rochelle Coburn <teacher88r@gmail.com> wrote:
Dr. Avery-Leaf

Please send me a copy of all your records including my tests, so I can give them to my counselor and psychiatrist.

Thank you,
Rochelle Coburn

## Kysa Crusco

**From:**      Kysa Crusco <kysa@cruscolaw.com>
**Sent:**      Friday, August 29, 2014 12:21 PM
**To:**        'sarah avery-leaf'
**Subject:**   FW: Evaluation

As an FYI – the Court granted Jim's ex-parte motion yesterday for sole residential and legal custody of Danielle. Rochelle made another report to DCYF and the state police regarding Dani and her friend Reilly engaging in sexualized behaviors and then kept Dani from Jim until the police became involved and helped transfer custody. Rochelle has requested a hearing for next week on the new orders.

Kysa M. Crusco
Crusco Law Office, PLLC
24 Eastman Ave, Ste C4
Bedford, NH 03110
(603) 627-3668
(603) 218-6498 (fax)
http://www.nhfamilylawblog.com
http://www.cruscolaw.com

This email message and any attachments are confidential and may be privileged. If you are not the intended recipient, notify Crusco Law Office, PLLC immediately -- by replying to this message or by sending an email to info@cruscolaw.com-- and destroy all copies of this message and any attachments.

**Rochelle Coburn** <teacher88r@gmail.com>                    Sat, Aug 30, 2014, 8:20 AM      
to Kysa

**Kysa,**

I'm writing to let you know that I requested to have my court ordered supervised visit today as it is the end of the week. Jim has informed me does not want to allow that to take place. In addition, Jim will not allow me to even speak to my daughter on the phone. I'm sure she is wondering why she can't speak to her mother as I usually call her every night and/or every other night. Given the fact that Danielle only feels safe sharing personal information with me and her counselor, I am very concerned about her emotional well being.

Do you have anything you'd like to share about his current situation?

Rochelle

On Aug 30, 2014, at 8:53 PM, Rochelle Coburn <teacher88r@gmail.com> wrote:

> Are you willing to jump back in? I can't pay you much, but I'm still working and gave an interview for a full time teaching position on Tuesday. I have a hearing Wednesday at 2pm.
>

Section Gal 203.03  Dismissal of Complaints and Oral Argument on
                    Dismissal or Nonacceptance of Complaints

PART Gal 204  CONDUCT OF HEARINGS BY PRESIDING OFFICER;
WAIVER OF RULES
         Section Gal 204.01  Presiding Officer
         Section Gal 204.02  Withdrawal and Recusal of Presiding Officer
         Section Gal 204.03  Waiver or Suspension of Rules by Presiding Officer or
Board

    PART Gal 205  TIME PERIODS
         Section Gal 205.01  Computation of Time

    PART Gal 206  FILING, FORMAT AND DELIVERY OF DOCUMENTS
         Section Gal 206.01  Date of Issuance or Filing
         Section Gal 206.02  Format of Documents
         Section Gal 206.03  Delivery of Documents

    PART Gal 207  MOTIONS AND OBJECTIONS
         Section Gal 207.01  Motions; Objections to Motions; Ruling on Motions

    PART Gal 208  COMMENCEMENT OF ADJUDICATIVE PROCEEDINGS;
                  APPEARANCES; PRE-HEARING CONFERENCES;
                  RECORDING THE HEARING
         Section Gal 208.01  Commencement of Adjudicative Proceedings
         Section Gal 208.02  Complaints and Disciplinary Proceedings
         Section Gal 208.03  Appearances
         Section Gal 208.04  Prehearing Conference
         Section Gal 208.05  Recording the Hearing

    PART Gal 209  INTERVENTION; ROLES OF COMPLAINANTS AND BOARD
STAFF
         Section Gal 209.01  Intervention Procedure
         Section Gal 209.02  Effect on Intervention and Rights of an Intervenor
         Section Gal 209.03  Role of Complainants and Board Staff

    PART Gal 210  CONTINUANCES AND FAILURE TO ATTEND HEARING
         Section Gal 210.01  Continuances
         Section Gal 210.02  Failure of a Party to Attend or Participate in the Hearing

    PART Gal 211  CONFIDENTIALITY ORDERS AND REQUESTS FOR
                  INFORMATION AND DOCUMENTS
         Section Gal 211.01  Voluntary Production of Information

Gal 203.03  <u>Dismissal of Complaints and Oral Argument on Dismissal of Complaints</u>.

(a)  The board shall dismiss a complaint, at any time, in a written and dated notice to the complainant and the guardian ad litem complained against, when it concludes that:

    (1)  The complainant failed to file additional information after receiving notice that the complaint was incomplete, pursuant to Gal 203.01(e)(2) or (f);

    (2)  The board has no authority to regulate the actions or omissions about which the complaint has been made;

    (3)  The allegations in the complaint, taken as true, do not constitute misconduct under RSA 490-C, the rules of the board, any order of the board, or any statute which is within the authority of the board to enforce;

    (4)  The actions alleged were purportedly committed by a guardian ad litem prior to the time of the adoption of any rule by the board prohibiting the conduct at issue;

    (5)  The actions were allegedly undertaken at a time when the guardian ad litem was not certified by the board;

    (6)  The complaint addresses action by a particular guardian ad litem that the complainant has already previously brought to the attention of the board, and on which the board has previously acted;

    (7)  The complaint has been filed for the purpose of disrupting or delaying the progress of a matter then pending in a court;

    (8)  The complaint has been filed for the purpose of attempting to motivate a guardian ad litem to violate his or her ethical obligations, including, but not limited to, the obligation that he or she reach an independent conclusion about what is in the best interest of the recipient of services or such other matter as may be required by the orders or instructions of the appointing court;

    (9)  Pursuant to RSA 490-C:4, I (g), the complaint relates to the actions of a guardian ad litem in a case in which a trial or judicial proceeding is in progress, unless the board, for good cause, votes to proceed immediately with such complaint;